**VIERECK v. UNITED STATES.**

No. 8204.

United States Court of Appeals for the
District of Columbia.

Decided Sept. 21, 1942.

Writ of Certiorari Granted in Part.
Nov. 16, 1942.

See —— U.S. ——, 63 S.Ct. 202, 87 L.Ed. ——.

Mr. O. R. McGuire, of Washington, D. C., for appellant.

Wendell Berge, Asst. Atty. Gen., with whom Messrs. William Power Maloney, Special Assistant to the Attorney General, and Oscar A. Provost and Andrew F. Oehmann, Department of Justice, both of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and VINSON, Associate Justices.

VINSON, Associate Justice.

### Statement of the Case.

Congress passed a law on June 8, 1938, requiring "political" agents of foreign principals to register with the State Department.[1] It was further required by this Act and the 1939 amendment that these

---

[1] 52 Stat. 631–633, 22 U.S.C.A. § 611 et seq.

registrations be kept up to date with supplemental statements every six months.[2]

Appellant (defendant) registered and also made supplementary statements. The charge against him is that in three of the supplemental registrations he willfully omitted to state facts made material by the Act, the regulations and appropriate forms of the State Department. The willful omission of a material fact is made a crime under Section 5 of the Act.[3]

A jury has found defendant guilty after a relatively long trial. Defendant alleges many errors, none of which is assigned to the general sufficiency of the evidence, and none could be. Defendant argues, however, that he was indicted for one crime and tried for another, neither of which was a violation of the Act. Defendant further argues that in response to Item 11 of a State Department form requesting the nature of his business, his answer that he was an author and journalist, and only that, was correct. It is argued that the Act is too indefinite for a penal statute. Issue is taken with a number of the Court's instructions, with the admission of certain evidence, and with the exclusion of other. Also it is said that the Court refused to require production of evidence on defendant's behalf. Other errors alleged are the exclusion of one of defendant's trial counsel and misconduct on the part of the prosecutor. The last error relied upon is that costs could not be imposed.

■■■ At the outset, it is clear that the Act[4] requires the registration of "political" agents of foreign principals.[5] Roughly, the test to determine if one is subject to the Act is whether he is engaged in political activities as distinguished from nonpolitical ones; hence, the term "political" will often be used as a shorthand expression. It is also clear that the Act and regulations require the revelation of the details of the agreements with, and activities under, this political foreign principal-agent relationship.[6]

## The Main Question.

Against these clear requirements stands the biggest question of this case, do the Act and the authorized regulations issued thereunder require, *in addition to* the revelation of his political activities *under the contract with, or in behalf of, the foreign principal,* the disclosure in some detail of *all other political activities* of the registrant, at least when these political activities are *regular enough to be called a part* of his business.

The jury was instructed in this case that the proper construction of the Act, regulations and forms require the registrant in his supplementary statements to reveal *all* of his "political" activities for the previous six months *whether or not* the activities were *as agent* for the foreign principal. The discussion of the main question will necessarily cover not only this defendant's objections to the instructions given, but also much of his argument that he was indicted for one crime, and tried for another, and neither of which constituted a violation of the Statute.

## Synopsis of the Act.

The Statute is entitled, "An Act to require the registration of certain persons employed by agencies to disseminate propaganda in the United States and for other purposes." Section 1 of the Act defines, inter alia, "foreign principal", and "agent of a foreign principal". "Foreign principal" includes (a) the government, a political party, or a business, of a foreign country, (b) any person domiciled abroad, and (c) any domestic organization partly subsidized by any of the foreign principals. An "agent of a foreign principal" is any person who acts as a public-relations counsel, a publicity man, a servant, a representative, or an attorney for a foreign principal, and any person who receives pay from, or is under the direction of, a foreign principal is included. There are five exceptions. The first three exclude from the agent definition duly accredited

---

[2] 52 Stat. 632, as amended in 1939, 53 Stat. 1244, 1245, 22 U.S.C.A. § 613. The 1938 Act required a supplemental statement in six months. The 1939 Act required a supplemental statement every six months.

[3] 52 Stat. 633, 22 U.S.C.A. § 615.

[4] We are concerned with the 1938 Act as amended in 1939. 52 Stat. 631, 53 Stat. 1244, 22 U.S.C.A. § 611 et seq.

The 1942 Act now in effect on similar subject matter has some significant differences. Pub.L. No. 532, 77th Cong., 2d Sess., c. 263 [S. 2399], April 29, 1942, 22 U.S.C.A. § 611 et seq.

[5] Section 1, as amended, and Section 2.

[6] Section 1, as amended, Section 2, Section 3, as amended, and Items 12–15 of the form.

diplomats and all foreign officials or employees who are of record at the State Department. The fourth excludes from the agents with whom the Act is concerned persons who are performing only private, nonpolitical, financial activities in furtherance of bona fide trade or commerce. The fifth exception is similar, excluding persons engaged only in bona fide religious, scholastic, academic, scientific, or fine arts activities.

Section 2 of the Act requires every person who is or becomes an agent to register on a form prescribed by the Secretary of State. This form is to set forth (a) name and address of registrant; (b) name of foreign principal; (c) a copy of the contract, if written, or a full statement of terms and conditions, if oral; (d) the date of the contract, the date performance starts, and the duration of the contract; (e) the method and amount of payments; (f) the name of every person contributing to the compensation; (g) if the registrant is an organization, the instruments relating to its powers, structure, and purposes.

Section 3 of the Act deals with the supplemental registration statements with which we are particularly concerned in this case. These must be made every six months and shall set forth (a) such facts as make the information under Section 2 current and accurate; (b) the amount and form of the compensation now received; and (c) "a statement containing such *details* required under this Act [subchapter] as the Secretary shall fix, of the activities of such person as agent of a foreign principal during such six months' period."[7] [Italics supplied]

Section 4 provides for the retention of the statements by the State Department, their availability to and withdrawal from the public. Section 5 is the penal provision; its essence for this case has already been mentioned. Section 6 has the common delegation to an administrative body allowing the Secretary to prescribe such rules, regulations, and forms as may be necessary to carry out the Act. Section 7, 22 U.S.C.A. § 611 note, states the effective date of the Act.

### Synopsis of the Regulations.

The pertinent regulations promulgated by the Secretary follow the outline of the Act. The definitions of terms for the most part are fuller; additional terms such as "government of a foreign country", "public-relations counsel", "nonpolitical activities in furtherance of bona fide trade or commerce", are defined. These definitions further emphasize the delineation between political and nonpolitical. The former may have a foreign slant or a chance of a foreign slant. The latter is the ordinary financial trade and commerce. Under this statutory law the State Department and the people want to know all about the former and are not interested in the latter.

The regulations proceed to state that every person required to register either originally or supplementarily shall fill in the appropriate form prepared by the Secretary of State. The 19 items of the two forms are the same except for the one instance which will be noted. The first six items deal with name, addresses, and status (e.g., individual, corporation) of the registrant. Items 7 to 9 ask the name, address, and nationality of the foreign principal. Item 10 reads, "Nature of business of foreign principal". Item 11, "Comprehensive statement of nature of business of registrant". Item 12, "Identification of all contracts of employment or other documents submitted herewith to indicate in complete detail the nature of the employment of registrant, and the terms and conditions thereof. If contract is oral, a full statement of the terms and conditions thereof must be submitted herewith and identified herein." Items 13 to 15 deal with the date and duration of the contract, the compensation promised, and the source of pay on the original registration or the pay actually received during the preceding six months on the supplemental statement. Item 16 concerns articles of incorporation and the like, not applicable to an individual. Item 17 asks the nationality of the registrant. Item 18 is the official designation of the registrant, and Item 19 is the date of the statement.

Then the regulations proceed to point out that all questions must be answered. Where there is not sufficient space, supplementary papers should be incorporated by reference.

Paragraph (5) of Chapter IV of the regulations contains this warning: "Acceptance by the Secretary of a registration statement submitted for filing shall not necessarily signify a full compliance with the act on the part of the registrant, and such acceptance shall not preclude prosecu-

---

[7] 53 Stat. 1246, 22 U.S.C.A. § 613.

tion as provided for in the act for a false statement of a material fact or the willful omission of a material fact required to be stated therein."

Paragraph (12) of the same chapter is particularly pertinent in this case. "Agents of foreign principals who engage, whether or not on behalf of their foreign principal, in activities not included among the exceptions set forth in the act and regulations shall be considered subject to the requirement of registration."[8]

### The Secretary's Power under the Act to Require the Disclosure of ALL Political Activities.

A registrant's activities might be of four kinds: (1) political activities pursuant to his agency relationship with a foreign principal, (2) his political activities on his own behalf, not a part of the foreign agency, (3) nonpolitical activities in connection with a foreign agency, and (4) nonpolitical activities on his own, not a part of any foreign agency. Work in the first category is the kind that makes it necessary for a person to register, and, of course, when he registers he must make a full disclosure of all activities that fall within this category. In this case we are not concerned to what extent, if any, a registrant must reveal his activities in the last two categories. The question in this case is whether the registrant must make a full disclosure of activities within the second category.

The Title reveals that the Statute is for the purpose of registering persons employed by agencies to disseminate propaganda, and for other purposes.[9] A reading of the Act shows that one of those purposes is disclosure. When the concern is with disclosure of propaganda, a measure would be a half-way one if it did not require one to reveal the propaganda he puts out on his own as well as the propaganda he puts out as an agent. Otherwise it could not be known in which of his dual capacities a registrant was acting. It seems that the Act in its broad structure has taken this logical policy into account.

The specific provisions of the Act carry out the compass indicated by the Title. Section 2 says that the form shall set forth certain things. The emphasis here seems to be on the terms and conditions of the contract, written or oral, with the foreign principal, and upon the amount, source, and form of the agent's pay.

■ Section 3, dealing with the supplemental registration (upon which this indictment is based) provides that the material under Section 2 is to be kept current and accurate, the compensation actually paid is to be stated, and by subsection (c) there shall be "A statement containing such details required under this Act [subchapter] as the Secretary shall fix, of the activities of such person as agent of a foreign principal during such six months' period."[10] Clearly, this authorizes the Secretary to set the degree of generality or specificity of the disclosure of the registrant's business and activities.

There might be some question as to whether in this provision the phrase, "as agent of a foreign principal," designates the type of activities or the class of persons. Defendant's arguments, based on the Act, did not raise the issue and as a result the Government's construction did not develop this possible point. As the 1938 Act is printed there is more difficulty of construction because such person[s] is in the plural.[11]

If "as agent" designates the activities, i. e., a statement of the agent-activities, it would have been better for "agent" to be in proximity with "activities". If "as agent" designates the class of persons, then it is somewhat redundant for it is abundantly clear who "such persons" are, and grammatically it might have been well to introduce "agent[s] of a foreign principal" with "who are".

■ Since in the 1939 amendment "person" is in the singular as is "agent", and since it seems a better construction of language to have "as agent" designate the class of person rather than the type of activities, we interpret the provision as follows: a statement of the activities of such person (an agent of a foreign principal) during such six months' period. This means that

---

[8] Compare paragraph (17): "Activities connected in any way with the establishment or conduct of a foreign government shall not be considered to fall within any of the exceptions * * * and persons undertaking to engage in such activities shall be considered subject to the requirement of registration."

[9] See Crawford, Statutory Construction (1940) §§ 87, 206, and United States v. American Trucking Associations, Inc., 310 U.S. 534, 542, 544, 60 S.Ct. 1059, 84 L.Ed. 1345.

[10] 53 Stat. 1246, 22 U.S.C.A. § 613.

[11] 52 Stat. 632.

the phraseology is a little tautological, but we assume that is the result of seeking clarity, and in our view the redundancy being slight, a strained construction to avoid it is not justified. Thus we conclude that section 3 sub. (c) authorizes the Secretary to require a statement of all the activities (at least the political kind with which we are concerned) of a registrant.

Sections 3 and 2 are not the only parts of the Act, however, which authorize the Secretary to call for material. Section 6 provides that the Secretary is authorized and directed to prescribe such rules, regulations, and forms as may be necessary to carry out the Act. In view of the logical necessity of knowing all of an agent's political activities either as an agent or on his own and in view of the fact that "carry out" must mean "make workable", it appears that the Act authorizes the Secretary to require the full disclosure. Some such implementation of statutes is common and desirable.

It is of interest to note that this authorization is running to the Secretary of State. The President, the Head of our Executive Branch, has the main power over foreign affairs. The Department of State is the cabinet branch through which the Executive works in problems of foreign affairs. This Act deals with agents who disseminate propaganda for foreign principals. While the registrant may be a citizen of this country, he may put himself under the Executive's power over foreign affairs when he acknowledges that he is a paid political agent of a foreign principal. Thus one can read a little more liberally the Act's authorization to the Secretary to do that which will make the statute work,[12] and a full disclosure of all political activities of an agent as agent or as his own is a sine qua non for feasibility. An object of the Act must be to know from all that is going on around the country that which may be subsidized by principals outside of the country. The foreign purse can have a lot to do with the convictions expressed under the smoke-screen of free speech.

The Secretary Has Exercised His Power to Require Disclosure of ALL Political Activities.

We conclude then that the Secretary has the power to require a full disclosure of all political activities of a registrant.

Our next question is whether that power has been exercised.

A fair interpretation of paragraph (12) of Chapter IV of the Regulations would be that it had been expressly discussed. "Agents of foreign principals who engage, *whether or not on behalf of their foreign principal,* in activities not included among the exceptions set forth in the act and regulations shall be considered subject to the requirement of registration." [Italics supplied]

Doing some paraphrasing suggested in part by the defendant during oral argument, this regulation reads: (political) agents of foreign principals who engage in (political) activities shall register. This is a fair transposition if the language "whether or not on behalf of their foreign principal" is excluded, for the only agents of foreign principals with which the Act is concerned are political ones, and again activities that are not among the exceptions are political ones. Yet this can scarcely be the meaning of the regulation for it is already abundantly clear that political agents are to register. Hence it seems that the important clause is, "whether or not [the registrant's activities are] on behalf of [his] foreign principal". Whether or not they are, he shall be subject to the requirement of registration, and being subject to the requirement of registration must mean not only the act of registering but also all the duties and concomitants of registration. We interpret the regulation to mean that all political activities of an agent, whether they are done as a part of his agency or on his own, shall be fully disclosed.

This interpretation is fortified by question 11 of the form: "Comprehensive statement of nature of business of registrant." Other items in the form bring out the nature of the foreign principal's business, and the details of the principal-agent relationship. Item 10, for example, reads: "nature of business of foreign principal * * *." In Item 11 attention is focused upon the registrant and the scope of the statement is enlarged: make a comprehensive statement of the nature of your business. In view of a large part of the meaning of the word comprehensive, we believe that the answer, public-relations, for example, would not be satisfactory. Comprehensive's usual meaning calls for more

[12] Compare United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 225.

fullness and more detail than that.[13] The form, moreover, has some 8½ blank lines after this statement. The registrant has been warned to file supplementary papers if necessary in order to give complete answers.

■ This item of the form does not merely fortify our interpretation of the regulation in paragraph (12). Item 11 in itself is an exercise of the Secretary's power requiring registrant to reveal his own political activities. The form is a regular and official action of the Secretary. Its effect is that of a rule or regulation. We conclude that the statute authorizes the Secretary to require and the Secretary has required a registrant to reveal with some semblance of detail all "political" activities.

### The Charge Against this Defendant.

We come now to the circumstances of this case. The Government charges that defendant willfully omitted to disclose material facts in three supplemental registration statements. This covers roughly the period from October 1, 1939, to April 25, 1941. More particularly the Government charges that defendant's answer, "author and journalist", to Item 11 was not a comprehensive statement of the nature of his business. The Government proceeds to show much work beyond the scope of defendant's statement. Much of this work reveals defendant as a very active propagandist. That, the Government charges, was a pursuit, an activity, which the defendant did not disclose either in general name or in modus operandi. Propaganda is a political activity; thus it is definitely under the coverage of the Act, as just construed, no matter for whom the work was done. The jury concluded that defendant had been engaged in at least some of the activities the Government tried to prove, that defendant had willfully failed to disclose them, and that they were material.

### A. Indictment Within the Statute.

■ With the smoke cleared away we can dispose of much of defendant's argument in short order, namely, his contention that he was indicted for one thing, tried for another, and neither of which was a crime under the Statute. Defendant's contention is euphonious but not meritorious.

It is argued that the crime charged in the indictment is not within the Statute because the former alleges that defendant willfully omitted to set forth a, b, and c, as a *part* of his business and *activities* whereas the latter with its appropriate regulations and forms requires only a statement of the *nature* of registrant's *business*. The use of the word, part, in the indictment can be readily supported. After all, defendant did disclose some of his business. Naturally he could only omit a part, not all. That he failed to disclose a part of the activities, rather than a part of the nature of the business is too subtle a distinction in wording to make the indictment defective. The nature of one's business may be a more generic abstraction describing one's pursuit than a list of his activities, but the generalization must come from several types of activities to be an accurate definition. When a *comprehensive* statement of the nature of one's business is required then there must be some detail for completeness and accuracy. Moreover, the Act mentions activities as an agent, and paragraph (12), already discussed at some length, uses the word activities. By that time a registrant is notified that nature of business and activities are to be used interchangeably or at least as approximate synonyms. We cannot accept the hypertechnical argument of defendant.

### B. Crime Proved Within Indictment and Statute.

■ It is argued that the crime tried was not that charged in the indictment, nor was it an offense under the Statute. Defendant makes the vivid statement that he was tried for being a propagandist. Stating the case this way makes an appeal, of course, to all our people who relish and support our civil liberties. Defendant, however, was tried for (and his brief as well as many parts of the record show that he was well aware of it) willfully omitting to state material facts in his three supplemental registrations. More particularly he failed to reveal fully what his "political"

---

[13] Webster's New International Dictionary (2nd Ed., 1939) defines comprehensive as follows:

1. Including much; comprising many things; having a wide scope; inclusive; as, *comprehensive* definitions, ideas.
2. Having the power to comprehend

many things; of wide mental grasp. "His *comprehensive* head." *Pope.*

3. *Logic.* Intensive.

Syn.—Extensive, wide, large, full, compendious.

Ant.—Narrow, limited, restricted, circumscribed.

work was. He said that he was an author and journalist. That is, to be true, a small part of the truth. But he was much more than that. It may be unfortunate that a part of the more he was, was a propagandist, but such was the case. The Government had to show, inter alia, that he was a propagandist in order to prove a part of his work which he willfully omitted to disclose. So naturally there is talk of propaganda in the case, but defendant was not tried for being a propagandist. He was tried for failing to disclose some of his propagandistic work. The error of defendant's argument can be readily seen if we state a suppositious case. If this country were making an extensive manpower survey and one of the questions sent to citizens was, state all professions, trades, and businesses in which you have ability and skill, and if the Act made the failure to make a full disclosure a crime, and if our hypothetical registrant put down author and psychology teacher, and if later it was learned that he was no mean chemist, would it be said that the subsequent prosecution tried him for being a chemist?

In this connection defendant states in his reply brief in italics: "Therefore, this case on appeal must be limited to the alleged failure to reply properly to paragraphs 11 of these three supplemental registration statements and to them alone. The Government's brief fails to make this clear. It confuses and beclouds the issue as it was beclouded in the trial court." If the Government's brief here beclouds the issue as it was beclouded in the trial court, then it was not beclouded there.

We have read all the record brought to us in defendant's Appendix and we have read liberally from a copy of the original transcript. We believe that the issues were kept quite clear considering the length of the trial and the amount of the evidence necessarily taken. If anything the Government beclouded the issue less than defendant.

### Activities Not Disclosed.

As indicated, the main issue of the trial was the failure of defendant to disclose a material part of his business. Defendant said that he was an author and journalist while registering for two foreign principals, the one, the Munich Newspaper, the other, The German Library of Information. Was he more than an author and a journalist? Without doubt the answer must be in the affirmative. In many cases there would be no call to discuss the evidence in a situation like this where the evidence is more than sufficient and the sufficiency is not in issue. Considering the times and the features of this case we think that it is well, however, to give some of the factual detail to remove any lingering doubts of the propriety of this conviction and sentence. This discussion will also throw light upon the general lack of merit and de minimis nature of defendant's contentions concerning other alleged errors.

Defendant's business on which evidence was taken and which he did not disclose over the 18 months' period may be put into four classifications: (1) his direction and control of Flanders Hall, a publishing institution, interested in political subjects; (2) his organization of, and activities in behalf of, Make Europe Pay War Debts, Islands for War Debts, and possibly War Debts Defense, Committees, all with a political twang; (3) his work in helping a late Senator prepare his expression of views on political topics; (4) his assistance in disseminating political views of Congressmen coinciding with his own, or coinciding with, or at least of no hindrance to, those of his foreign principals from whom he was receiving a large income.

### A. Flanders Hall.

Flanders Hall was incorporated in 1939 as a small New Jersey publishing house by the Hauck brothers. It came to pass that Sigfried Hauck, the President of Flanders Hall, Inc., met defendant after defendant had praised Hauck's book, published by Flanders Hall. This was the only book Flanders Hall had published; as it turned out it was the only book published by Flanders Hall from some time in 1939, when it was incorporated, until after defendant took over in August, 1940. Similarly, defendant's commendation was one of only a few received by the author. The defendant became interested in Flanders Hall.

After a time, on August 3, 1940, defendant and Flanders Hall, Inc., executed a written contract prepared by defendant. Part 2 read: "I [defendant] have from time to time certain works which I would like to see published and distributed and I am willing to advance the necessary expense for this purpose under proper terms and conditions." This is probably not the usual publisher-author arrangement. Defendant, may it be remembered, registered as an au-

thor and journalist. Part 5 read: "In view of my interest in the company and the obligations which I am taking upon myself, you agree to make no disbursements, large or small, without my written consent; to furnish me weekly with a statement of expenses; to give me or my deputies access to the books of the company whenever requested and to incur no liabilities on behalf of the company without my knowledge and consent. Failure to abide by this clause will invalidate any obligation on my part toward the company." Part 6 provided: "* * * Flanders Hall, Publishers, give me the option to purchase 66⅔ per cent of their outstanding capital stock at a price not to exceed $500." Again, this is probably not the usual publisher-author relationship, and it definitely put defendant in financial control of Flanders Hall.

Defendant was concerned with policy as well as with financial control. Flanders Hall set out on a series of Books-of-the-Hour. In one of its circulars, drumming up a market for this series, appears a letter by the editor-in-chief which it was shown was prepared by Hauck and the defendant.

"Dear Fellow American:

"I am writing to you because I am sure that you are anxious to see the United States stay out of all foreign wars. * * *

"* * * We are urged to give our blood and our treasure to make the world safe for British 'democracy'.

"Common sense dictates a rigid examination of the 'democracy' we are asked to redeem. Books-of-the-Hour vividly illustrate, among other vital issues, the workings of this 'democracy' in India, in Ireland, in Egypt, in Palestine and elsewhere. These books are based on authentic material from many sources. * * * The facts were known to every schoolboy in the past, before skillful propaganda gradually erased them.

"* * * In this spirit, Flanders Hall has embarked upon a campaign of education. Ours is a patriotic task, for which we freely ask the support of all those who believe with us in America First and America Only.

"Yours for our country's sake,"

With an expressed effort to show the American people the inside information on how badly democracy is working, particularly in the British Empire, and with the revelation that "Flanders Hall has embarked upon a campaign of education", it is certain that activities are revealed which are within the scope of the Act.

Clearly, defendant's work in Flanders Hall was more than that of "author and journalist". Assuming for the moment that the revelation of all the details of a registrant's business is not required, this designation of author and journalist does not even summarize the outer confines of defendant's occupational pursuits. When defendant, in another separate registration, registered as agent for one Wirsing, Editor of the Munich Newspaper, to handle a book in this country which was put out by Flanders Hall in a fashion similar to that of the Books-of-the-Hour, he designated himself as "author, journalist, and publicist." So when defendant controlled a publishing house, when he supervised a circular that was its chief means of advertising, he was at least a publicist by his own better judgment, irrespective of how much more he may have been. Moreover, defendant had said that Flanders Hall interested him; he liked the idea of running a publishing house because it would give him something to fall back on. After the idea was realized, then, it would seem that the running of Flanders Hall was a part of his business.

Merely giving the most generic terms possible in describing the nature of registrant's business is not, we believe, a compliance with the spirit of the Act. This is brought out in bolder relief in this case when it is realized that some of the publishing done by Flanders Hall was surreptitious. There was proof that two of the books published by Flanders Hall concealed the source of their texts. One purported to be from the French of La Touche. Another purported to be from the Dutch of Vroom. In fact both of these books were translated from the German of other authors and had been published by the German Information Service. One other book purported to be compiled from British sources by an Ethiopian, when in fact its author was German. Defendant directed Hauck to change the names of the authors on two additional manuscripts. When books are written on international problems and the author is shifted from one country to another under a fictitious name, it can readily be appreciated that at least one object of those in control is to mislead the reader. Flanders Hall embarked upon a campaign of "education", but much of its

work was secretive. The defendant reminds us: "Propaganda may insidiously disguise itself as education. It may pretend that it is merely a straightforward campaign for publicity. But it varies from both education and publicity in that the element of camouflage in one form or another is always present."[14]

Defendant was in control of Flanders Hall. As such he was at least a publisher, a propagandist, and a publicist as well as being an author. Defendant failed to state this kind of work that he was doing, and his interest in, and operation of, Flanders Hall.

### B. The War Debt Committees.

One of the employees of the Make Europe Pay War Debts Committee testified that defendant told her that he and three others had organized that Committee. This employee further testified that she had reminded the defendant that two prominent columnists had said that he was giving candy to office girls on Capitol Hill. She further reminded him that she had seen him two or three times in the Committee's office. In reply, she testified, defendant said to her, "I should have brought you some candy, and then you would not have seen me over there."

The evidence showed that one of the chief jobs of the Committee was to send out speeches of isolationist Congressmen. At times the Committee had seven or eight employees addressing franked envelopes to carry the speeches. Isolationist speeches by Congressmen are definitely political material unless the subject matter of politics has been greatly changed recently.

We have defendant's admission that he was one of the organizers of the Committee. There was much evidence from which it could be inferred that he was a director of the Committee after its organization. The forming and running of a committee of this kind is a business pursuit of some sort. Under the law defendant was called upon to make a disclosure, and even if he only designated the broad nature of this part of his business he should have said something to the effect that he was an organizer and a director of committees to disseminate political material, and named them.

The name of the Committee was later changed to "Islands for War Debts Committee". It was suggested by the record, although we believe that there is no direct testimony, that the name was later changed again to War Debts Defense Committee.

### C. Assisting in the Preparation of a Senator's Speeches.

The defendant worked with a late Senator on at least three speeches, entitled, "Lord Lothian vs. Lord Lothian", "German-American Trade Relations", and "Six Men and War". While the first was largely quotations from speeches and writings of Lord Lothian there was an introduction and the matter of arrangement. Further, some material for this speech was delivered to the Senator's office from the German Embassy at defendant's request. The second speech, the one on trade relations, found defendant dictating the outline in the Senator's office. Again the defendant had the German Embassy send over some material. Later the Senator told one of his employees in defendant's presence that he would not use the material the employee had collected, because the defendant had better material. In connection with the third speech one of the Senator's employees testified that she heard the defendant say to the Senator, "I have tried to phrase it in the best way I could in the manner in which you speak."

Assisting a Senator in the preparation of his speeches, and maybe even aiding him in reaching the views that were to be conveyed, would seem to be political activity. Perchance such work is only that of an author, but we think that it is more than that. Moreover, the defendant did not reveal in any way for whom he wrote. His registration statement would give the idea that he was writing only that which appeared under his name. The spirit of the Act required defendant to detail his disclosure more than he did. He should have been definite enough that others could consider his work for what it was. As it is, defendant was attempting to be sole judge of the nature and effect of his work. Registration is meant to do more than that.

### D. Disseminating Views of Congressmen on Political Topics.

We come to an activity carried on in connection with, or as a corollary to, the two immediately preceding ones just discussed, but it is a sufficiently distinctive type of work to be recounted in its own category. This activity is the work of picking out Congressional literature with views that are

---

[14] Viereck, Spreading Germs of Hate (1930) p. 11.

liked and seeing to it that they get before more people. The defendant became a sort of publicity agent for the "good" (from his viewpoint) already created. This dissemination, probably beyond the hopes of the original author, was of material obviously political in nature.

In this connection there was evidence that defendant secured from a clerk of a Congressman a mailing list of the National Committee to Keep America Out of Foreign Wars. This mailing list had some 100,000 names. Later this same clerk at defendant's request made a mailing list from "Who's Who in America".

The defendant had this clerk send out 125,000 copies of the "Six Men and War" speech referred to in the previous heading. There was much additional testimony concerning the insertion of material in the Congressional Record under Extension of Remarks, the ordering of reprints, mailing them out, from which it could be inferred that defendant was the instigator, organizer, and supervisor of many more instances of this same general type of activity.

---

Thus the evidence shows that defendant was engaged in at least four types of political activity which he did not disclose. He merely said, as to his business, that he was an author and journalist. Under our construction of the Act it was necessary for defendant to reveal these four kinds of political activity even if they were done entirely on his own. Hence defendant failed to disclose facts material to a full, truthful answer to Item 11: give a "comprehensive statement of nature of business of registrant." There was plenty of evidence that defendant acted willfully.

### These Undisclosed Activities May Have Been a Part of an "Undisclosed" Agency.

The instruction to the jury was that if they believed defendant willfully failed to state material facts, whether or not the activities were done pursuant to his agency, they should find him guilty. The discussion so far was necessary to justify the instruction in case the jury believed defendant was acting entirely on his own in respect of these undisclosed activities. The jury may have believed, however, that all or some of these activities were carried on by defendant in his capacity as an agent for foreign principals. To borrow from another field of law, it might be said that defendant was acting as an undisclosed agent as well as a known one. The failure to disclose activities done pursuant to an agency would be particularly pertinent under Item 12 where a registrant must set out his full agreement, oral or written, and we suppose, expressed or tacit. Also, again to make the Act feasible, the registrant should disclose what is done in behalf of his foreign principal even though it may extend beyond any agreement or contract, particularly when the foreign principal is paying at a rate high enough to include many "extras"; during the 18-month period involved, defendant received something like $65,000 from his three German principals. Of course the indictment might still focus upon Item 11 if it is believed that registrant's business as there used is meant to include both agency work and his own. Such a construction would mean some overlapping with Item 12.

On the matter that these undisclosed political pursuits may have been a part of the undisclosed agency, we quote interesting excerpts from a letter by defendant to an associate of The German Library of Information, one of defendant's foreign principals. The letter, partly in the nature of a contract, was marked "Agreed" by the Associate, Mr. Schmitz:

"January 25, 1941.

"Dear Mr. Schmitz:

" * * * It is perfectly obvious, as you yourself pointed out, that I am entitled to four or five times the salary I receive at present.

\* \* \* \* \*

"Facts in Review [the journal put out by the Library], *together with such literary work as I have from time to time undertaken for you, absorbs nearly my entire time.* I am not in a position to keep up my other journalistic activities or to write a book, which I have been planning for several years. I have not, since I undertook the job, had even one week's vacation. I do not complain of this, for what task could be more pleasant and more stimulating than to work for a better understanding between the land of my birth and the land of my adoption in spite of all obstacles placed in the way of neutrality and fair play? \* \* \*

"You have allocated to me from time to time *special remunerations as your literary*

*advisor. Your book ventures have developed considerably and make constant calls upon my attention.* * * *

\* \* \* \* \*

"You asked me what would be an equitable remuneration. After considerable thought, I reached the figure of $2,500 per month, which was the basis of our last conversation. * * * For the sum mentioned I shall continue my work for Facts in Review and act as your chief literary advisor on *all books sponsored by the Library.* * * *

"I need not repeat, because I know that you agree with me heartily, that the stipulations of my contract apply to any new work which I may undertake:

"1) It is clearly understood that I am not called upon to do any work which conflicts in any way with my duties as an American citizen.

"2) I am not required to sponsor any publication which in any way enhances the tension between the races and religions represented by the divers elements which make up the United States.

"3) This agreement may be cancelled by either side on three months' notice.

"4) In case the warmongers should succeed in poisoning the relations between your country and mine to such an extent that a rupture of relations takes place, we are mutually and automatically released from all obligations.

\* \* \* \* \*

"Permit me to assure you that it is both a pleasure and an honor to work with you, a man who, like myself, has drawn his intellectual sustenance from German and American sources and who considers no task more sublime than to break down with the battering ram of truth the barriers of hate and misunderstanding which propaganda, abetted by malice and ignorance, attempts to rear between your country and my own, the United States.

"Cordially yours,
"(Signed) George Sylvester Viereck."

[Italics supplied]

This letter even through its self-serving declarations of patriotism,[15] speaks for itself, but we wish to make one particular point before proceeding. In the letter defendant tells The German Library of In-

formation that his work for them absorbs nearly all of his time. Yet the four classes of work which we discussed and which he did not disclose were not exactly spare time jobs. It is no strained inference, in fact the thread of circumstance is not even pulled tight, to conclude that this undisclosed work was a part of defendant's agency with The German Library of Information.

There was much more evidence from which it could be inferred that defendant was carrying on his clandestine work in behalf of the foreign principals. It might have been better for the Government to have prosecuted this case on that theory alone. But that was not the way it was done. The case was presented to the jury on the basis of a failure to disclose all of registrant's business. If there was a failure to disclose any political activity, it was a failure to disclose a part of his business.

There was more than sufficient evidence to show that many political activities were a part of registrant's business, and that they were a part of his business whether it was his business as an agent or his business on his own. Such a failure to disclose, willfully, these material facts constituted a violation of the Act.

### The Act and the Regulations are Sufficiently Definite.

We have discussed the more fundamental aspects of the case. The next contention made by defendant concerns the definiteness of the Act and its authorized regulations in view of the fact that a new crime is created. This proposition is related to the authorization issue, i. e., is it clear that the defendant had to disclose this kind of activity, and if so, to what extent. There is, in addition, another question. Since the crime of failing to disclose is limited to a material fact, is the standard of materiality objective enough for a criminal law.

In respect to the first part of the problem, the issue might be stated: was defendant notified that this type of activity, the type in which he was engaged but did not mention, must be revealed in some detail. It is considered a healthy aspect of our legal system that no person who sees a sign, "Danger! Thin Ice", is supposed to skate around until he finds the exact

---

[15] "It has been said that patriotism is the last resort of the scoundrel. It was the first resort of the propagandist. Every propagandist draped himself in the flag." Viereck, Spreading Germs of Hate (1930) p. 106.

breaking point.[16] There cannot be the slightest doubt that this defendant knew that the warning to disclose had been given. He also knew that he was skirting the line of demarcation in leaving unrevealed many of the things he did. Under such circumstances, one would be giving the outlaw more than the famous American sporting chance, if all possible doubts were to be resolved in favor of the defendant.

It is true that the 1942 Act is more definite. It states, in section 2 sub. (a) (6), "A detailed statement of every activity which the registrant is performing or is assuming or purporting or has agreed to perform for himself or any other person other than a foreign principal and which requires his registration hereunder".[17] The defendant stresses this 1942 Act, and argues that the fact that the 1938 Act as amended in 1939, fails to make this point or fails to make it so definitely and explicitly, is conclusive proof that such a point was not within the intendment of the earlier Act. In fact this argument is made so often and so fervently that one wonders what defendant would have done if there had been no 1942 Act. While there is some force in subsequent legislative history to show what earlier Acts covered, a certain amount of wariness must prevail. There is a chance that a later Act merely provided the same as an earlier in better language, or as may be the case here, the later statute may have directed that a detailed statement of activities in the registrant's own behalf be made, whereas the earlier Act authorized the Secretary to make the requirement. The fact that a certain provision is better said or is changed to a requirement rather than an authorization is not conclusive proof that it was never in the first Act, as defendant in practical substance contends.

In this particular instance of statutory history, the Report of the Judiciary Committee of the Senate accompanying the bill[18] which became the 1942 Act, in effect contradicts defendant's line of reasoning, based on this last Act. It shows that it was thought that the 1942 Act made no change in what a registrant had to disclose concerning the nature of his business. Four major and some minor changes are discussed, but this is not one of them. In fact, the Report incorporates a letter from the Attorney General which mentions this matter expressly. "The registration statement of an agent of a foreign principal engaged in the dissemination of political propaganda would require full information as to his relationships, status, activities, and financial transactions (sec. 2(a)). [Section 2(a) includes § 2(a) (6) quoted above.] *This provision of the bill is merely declaratory* with respect to the requirements of the registration statement of foreign agents as *now* prescribed or *may be* prescribed by the Secretary of State under section 2 of the existing statute."[19] [Italics supplied] If Section 2, dealing with the original registration, gives the authorization, obviously it is within Section 3 and its supplemental statement, which brings the material in the original registration up to date.

We have already discussed our conclusions that the Statute authorized, and the Secretary required, a statement in some detail of registrant's activities, including those which might be technically or even actually on his own. We conclude that the Act, the authorized forms and regulations, were sufficiently definite to notify the defendant and to be the basis of a criminal charge.

As to the argument that the term "material fact" in Section 5 of the Act is an inadequate standard, we need only point out that such a phrasal criterion has long been an accepted part of our system of laws. There have been many convictions of false swearing on a fact material to the issue. The self-same material fact idea and phraseology are used. After a layman has read this Act and these regulations, as he swears he has when he registers, the chances are he would have a far better idea of what facts are sought through the registration than an ordinary witness would have about what fact is material to a certain issue in a trial. Moreover, the registrant has far more time to select, reject, and frame his answer when filling out a registration statement than does a witness before a grand or petit jury. We conclude that the Act and the regulations are not too indefinite for supporting the criminal provisions.

---

[16] United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508.

[17] Pub.L.No.532, 77th Cong., 2d Sess., c. 263 [S. 2399], April 29, 1942, 22 U. S.C.A. § 612(a) (6).

[18] Sen.Rep.No.913, 77th Cong., 1st Sess., accompanying S. 2060.

[19] Id. at 11.

### The Discussion of the Legislative History.

 Defendant complains of the Court's discussion of the legislative history of the Act in its charge to the jury. As a rule, a court does not discuss before a jury the legislative history from which it draws material for its interpretation of a statute. Such "thinking out loud" is likely to be misunderstood by a jury whose contact with the law is casual.

In this case, the discussion of the forming of a special Congressional committee, the paraphrasing of that committee's report, the statements that the Act was intended to carry out the objectives suggested in the report, may have been an orientation course for the jury. This orientation may have enabled the jury better to see this case, their part in it, and may have given them a sense of perspective on modern history.

We conclude that the discussion of the legislative history was not prejudicial or reversible error. After this background discussion, the Court charged as a matter of law what the law was. The law so laid down was substantially in accord with what we have already said was the intent and proper construction of the Statute. The important thing is that the Court did not pass any of its functions to the jury. With the Court eventually declaring, in positive terms, the law, the jury were not misled, nor were they called upon to interpret the law, to attribute the degree of significance that should be given any part or all of the legislative history.

### The Book, "Spreading Germs of Hate".

 Defense counsel objected to the introduction of defendant's book entitled, "Spreading Germs of Hate." Defendant wrote this book in 1930 and it relates a story of propaganda in the 1914–18 war. The book is an interesting combination of facts, imagination, suggestions, and inferences. The author has said its purpose was to reveal propaganda and its technique, in order to immunize the American people against further exposure. The purpose could well have been further propaganda, an attempt to laugh off all the past so that those countries which had gotten far behind in the propaganda race could start off even again in the matter of selling themselves to the United States. Be that as it may the main theme of the book or the ultimate purpose of the author need not be fully and correctly understood for our purposes.

The book is largely autobiographical. The defendant shows himself to be a great propagandist of the last war. He reveals to some extent the methods of his foreign principal in that war. The book was introduced as evidence on the issue of intent or willfulness. It suggests the willful nature of defendant's acts set out in this indictment because of the similarity to those during the last war, and the book also shows defendant's thoroughgoing knowledge of how his foreign principal worked then. With this knowledge he was able to do it again with improvements. Of course propagandizing was no crime, but it shows that defendant knew how not to disclose too much.

The Government introduced the book with the argument that it revealed prior similar acts of propagandizing with its always present secrecy or confusion to show that any failure of the defendant to make a full disclosure was likely to be a willful act. The book, while revealing some prior similar acts, did not show a highly interrelated chain that were closely akin except for the fact that most of them would come under the head of propaganda. It might be better argued, therefore, that the book showed the author as an expert in this field of activity. If defendant was an expert in the relation of the law to propaganda and counter-propaganda, and if he was well versed in the necessity of a foggy atmosphere of confusion, secrecy and camouflage encompassing propaganda and counter-propaganda, then there is little basis for believing that anything defendant did in covering up the scent was done carelessly and inadvertently. In this book, defendant stated, "There is no safeguard which the law can create which human ingenuity cannot circumvent."[20]

---

[20] P. 90. We give a fuller quote here. Speaking of the law and the last war, defendant said, "While the law requires that the ownership of a newspaper must be fully disclosed, there was nothing to prevent the German Government or an individual German from making a present of several million dollars to an American sympathizer; nor was there anything to prevent the sympathizer from making this money talk—for Germany! There is no safeguard which the law can create which human ingenuity cannot circumvent." Compare the discussion above

This argument, of course, also supports the introduction of the book on the issue of intent. The book was subsequently used liberally by both sides. Later, the defendant made 18 prayers in respect of instructions to the jury. None of them in any way concerns the book. Hence defendant made no request for an instruction limiting its purpose. We see no error in the introduction or retention of the book as evidence.

### Defendant Was Not Improperly Prevented from Introducing any Evidence of Importance.

Defendant has assigned error in respect of "evidence" which the Court would not allow him to introduce.

■ Defendant sought to introduce proof to the effect that some 500 out of about 560 registrants answered Item 11 of the form like he did. During his offer of proof defendant's counsel stated that, "We propose to show that the statements filed by this defendant are entirely consistent with the Department of State's interpretation of the statute and their own regulations."

It is difficult to understand how the interpretation of many registrants as revealed, if there is any objective revelation at all, by their filling out of the forms, is indicative of the State Department's interpretation of the statute and their regulations. Moreover, the Department had made an express warning in this connection, "Acceptance by the Secretary of a registration statement submitted for filing shall not necessarily signify a full compliance with the act on the part of the registrant * * *."[21]

The defendant, apparently seeing the force of this argument, that one person's interpretation does not bind another, particularly when the latter has official status, has conceded that perhaps the offer of proof was not as clear as it might have been, but maintains that the offer, at any rate, also shows that the evidence tended to prove lack of willfulness of this defendant. If 500 out of 560 people read a statement with legal implications the same general way, it might appear at first blush that the defendant, one of the majority, had not committed an act that was a willful violation. Against this is the well

known general proposition that one cannot argue that this man committed no murder because there have been a lot of killings of late, some of them in self defense. It would seem, moreover, that it is almost certain that the quarrel over whether any given answer was "like" defendant's would be endless, and would present innumerable collateral issues.

In this case, there are several factors that may have entered into the answers of others, even assuming that they were like answers. First, for a large number of the registrants that type of answer might have been correct under their circumstances. Second, many of them may have omitted material facts, but not willfully. Third, one or two lawyers might have advised many of the total number of registrants. to answer that way. Fourth, there may have been a lot of evasive foreign agents in this country.

A Gallup poll is not a good way to show the intent of a particular individual. The time may come when there can be scientific break-downs to common denominators. If so, then if some tremendously high percentage react a certain way, and it is shown that this individual is a man of normal reactions and he reacted as the great majority did, such proof might have a little probative value. It may come to pass that courts will occasionally admit evidence along this line if human nature is analyzed so objectively that one dimension can be handled at a time and no imponderables remain. But as of today we see no error in the Court's ruling of exclusion. Counsel have referred us to no legal authoritative material to the contrary.

Defendant briefs two other rulings which curtailed his introduction of "evidence". One of the alleged errors occurred during defendant's cross-examination of an employee of the British Censor's Office, and the other occurred in connection with the Bureau of Internal Revenue's response to a subpoena issued at the request of defendant.

The Government brought to the stand an employee of the British Censor's Office in Bermuda. This employee testified that she had intercepted a manuscript of a certain ex-Senator sent by defendant to the German Embassy in Lisbon; the defendant had addressed the envelope to an alias

---

under the heading "These Undisclosed Activities May Have Been a Part of an 'Undisclosed' Agency."

[21] Paragraph (5) of Chapter IV of the regulations.

used by the Embassy. During cross-examination defendant's counsel asked if it was the job of that office to censor all mail going through Bermuda. A little later defense counsel asked for the size of the staff. The witness indicated that she was not free to answer either question under the policy of her government. The Court sustained her position and refused to instruct the witness to answer as requested by defendant.

■ From a reading of the record it does not seem that the questions were at all crucial or even pertinent to the defendant's case. The problem of balancing freedom of cross-examination, assuming that it is material · cross-examination, against other policy is one within the discretion of the trial court. Under the circumstances we are of the belief that the trial judge exercised his discretion in a sound manner, much less committing any abuse.

■ The remaining objection in the realm of evidence grew out of a sequence of events. The prosecution had introduced evidence in redirect examination which showed that a late Senator had used a "kickback" system in connection with his employees' salaries. The defense felt that the inference could be made that the Senator received the money for his own personal use. When the Senator's widow was on the stand she testified that the employees had made statements to the Bureau of Internal Revenue in connection with their income tax returns. The Government objected to further testimony on the ground that the statements were the best evidence. In response to an inquiry by the Court the witness testified that she could get the statements. It turned out that she could not. So the defense served a subpoena on the Bureau of Internal Revenue. A representative responded but without the papers on the basis that they were confidential. The Court approved his refusal to produce.

It can be seen that the clearing up of this matter in the Senator's office, even if it had moral implications, was not particularly material to the guilt or innocence of this defendant. Even if it were, it should be noted that the defendant after he learned that the papers were unavailable made no attempt to turn to secondary evidence, and the witness had indicated that she knew the contents of the papers.

■

## The Exclusion of One of Defendant's Counsel.

The last two points to be discussed deal with counsel. Defendant says that the exclusion of his counsel was error, and that the prosecutor was guilty of gross misconduct to the prejudice of defendant.

■ We deal first with the exclusion of one of defendant's trial counsel This counsel was questioning an employee of the Department of State who had prepared the registration form. Counsel was seeking testimony as to where the witness thought the statute authorized Item 11 of the form, and as to the meaning of Item 11. The Court had said, "If there is a question incident to the issue, it is a question of law for the Court." A little later, after several similar attempts and objections, the following occurred:

Defense counsel: "I am not asking this witness for a statement of law, if the Court please. He prepared these forms. He said he prepared these forms from the statute. I think it is a fair and reasonable question to ask him what portion of this statute this question was taken from.

"After all, he prepared them, we did not prepare them. ·If he does not know, who does know?"

The Court: "The objection has been sustained."

Defense counsel: "Now, if the Court please, I think your Honor has foreclosed us from a very important line of inquiry into this case. I think in view of your Honor's rulings throughout the Government's testimony and throughout the defendant's testimony, I charge that your Honor is biased in favor of the Government and prejudiced against this defendant.

"I say that this defendant has no alternative but to rest his case."

Government counsel: "Do I understand —"

The Court: "Any further questions?"

Government counsel: "No, we have no further questions at this time."

The Court: "You may be excused, Mr. Witness."

(Witness excused.)

Government counsel: "I understand the defendant rests."

The Court: "Has the defendant rested his case?"

Defense counsel: "Yes, if the Court please."

The Court: "Is there any rebuttal?"

Government counsel: "No, sir."

The Court: "Very well, the Jury will keep in mind the admonition [not to discuss, listen to any comment on, or form any opinion concerning, the case] and be back at 1:30."

(Whereupon at 12:30 o'clock P. M. a recess was taken to 1:30 o'clock P. M.)

After the recess, the Court, before the jury was brought back to the trial room, directed that the defense counsel concerned should no longer participate in the case. The Court noted that the defendant had two other able counsel, a copartner from a New York law firm, and a local practitioner. When counsel suggested that they had divided up the work and that the ejected counsel had done the preparation on some items still to come, the Court suggested that remaining counsel take additional time to get ready on their new work. A study of the record shows that defendant had adequate representation from that time on.

Although the Court's ruling, ejecting counsel, was out of the presence of the jury, defendant suggests that he was prejudiced because the jury could later see that this counsel was no longer active. Gauging such influence, if any, would be a very subjective job; at best the "prejudice" would be remote. In this case, moreover, work between counsel was divided up all of the way at both tables.

It appears that the trial court's action was perfectly proper. At any rate no prejudice has been shown and as far as we can see none existed to the defendant's case. Defendant's argument here, for the most part, is more of an attempt to vindicate counsel, or at least to suggest that there should have been a contempt trial before the lawyer was ejected, than to show prejudice to himself. If defendant's unwarranted explosion succeeded in the sense of obtaining a new trial, there would be put in the hands of all defense attorneys a highly useful but foul technique.

The Misconduct of the Prosecutor.

Defendant alleges that gross misconduct of the prosecutor was prejudicial to him. It is true that some of the conduct of the prosecutor involved was not exemplary, particularly in view of his office. Part of this in turn was due to the behavior of defense counsel. It, too, was not always exemplary. There were many uncalled for remarks on the part of both attorneys throughout the trial. We are not attempting to balance out the respective incidents of trial behavior, and it would not decide the issue of prejudice to the defendant if we did.

█ The first instance of alleged misconduct referred to by the defendant is that the prosecutor tried the case in the newspapers. There was no showing nor even any sufficient allegation of any concerted action between the prosecutor and the agents of the press. The defendant states that the newspaper stories had so roiled up the community that there should have been a change of venue or a continuance and he so moved. The record reveals that the jury was chosen very carefully, and both sides accepted the jury which was eventually sworn. These contentions carry us beyond the misconduct of the attorney. Even so, we think that the trial court properly exercised its discretion on the matter and all its corollaries.

█ The second example of defendant's charge of misconduct on the part of the prosecutor is the several allegedly inflammatory statements to the jury. We believe that many of the statements were improper. Most of the worst examples of inflammatory remarks, however, came in the closing argument, to which no objection was made until far too late. The objection was not made until after the closing argument was concluded, the Court was well along in its charge to the jury, and a noon recess had been taken.[22] No opportunity was given to the Judge or to the prosecutor to water down any flames started. Other remarks do not appear as bad in context as when isolated in defendant's brief. Some of the remarks were corrected during the course of trial. The Judge maintained a good surveillance in this connection. A careful study of the record shows that although some of the remarks of the prosecutor were improper, on the whole it cannot be said that there was prejudicial error.[23]

One of the items grouped under inflammatory statements to the jury involves ac-

[22] United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 237, 238, 60 S. Ct. 811, 84 L.Ed. 1129.

[23] Id., 310 U.S. at page 239, 60 S.Ct. 811, 84 L.Ed. 1129.

tions as well as words. Defense counsel had stated that they wanted copies of speeches referred to by a Government witness. The prosecutor indicated that he could bring them in by the mail bag full. Later during a conference at the bench concerning the recalling of a witness to identify the mail bags, the Court expressly ruled that the witness would not be returned. A reading of the record may give the inference that the Court did not want the mail bags around either, but there was no express ruling. Shortly thereafter, while the defense was busy cross-examining a witness, the prosecutor had the bags brought into the court room. The defense objected, and later the Court ruled them out of the room. This appears to us to be unnecessary stage business on the part of the prosecutor. We do believe that the ends of justice would not be served, however, by reversing on instances of improper action like this, considering the many aspects of this case, including a 1700-page record, and several thousand pages of exhibits.

Defendant's final contention pertaining to the misconduct of the prosecutor concerns his reading from certain memoranda from the files of a well known periodical. These memoranda were in connection with defendant's attempt to counteract a recent article in the periodical which discussed Hitler and an alleged "maid" who supposedly did more than clean the house and prepare meals. The memoranda were admitted in evidence over defendant's objection. It seems that the present argument is really a renewal of the objection to admissibility rather than to any misconduct on the part of the prosecutor. The prosecutor could not help the fact that the evidence dealt with subject matter potent in emotional connotations. The defendant has not seen fit to stand on the inadmissibility of the evidence.

### The Imposition of Costs.

Defendant alleges one further error. It is that costs could not be imposed upon him in addition to his sentence of imprisonment and fine. Such an argument is seldom made. It is directly contrary to the unamended 1792 Statute. "When judgment is rendered against the defendant in a prosecution for any fine or forfeiture incurred under a statute of the United States, he shall be subject to the payment of costs; and on every conviction for any other offense not capital, the court may, in its discretion, award that the defendant shall pay the costs of the prosecution." [24] Defendant cites three cases in his original brief,[25] supposedly in support of his argument. These cases do not touch defendant's asserted principle of law, top, side, or bottom.

The Government's brief called attention to the statute and to the case of Oates v. United States, 4 Cir.[26] Defendant's counsel give two full pages in their reply brief to the heading "Government Brief is in Error in Claiming that Sentence Was in Accordance with Statute."

In this two-page development, defendant's reply brief relies entirely upon its own assertions and upon the case of Whitworth v. United States, 8 Cir.[27] The reply brief makes the clash head-on. The brief quotes from the Oates case: " 'The Circuit Court of Appeals of the Eighth Circuit has expressly decided the point contrary to the position of the defendants. [Citing the Whitworth case.]' "[28] The reply brief continues: "The 4th Circuit Court of Appeals evidently did not know what the 8th Circuit did decide in the Whitworth case. That was a case of embezzlement from the United States and Section 4046, Revised Statutes, provided for imprisonment and a fine equal to the amount embezzled. The trial court imposed a sentence of imprisonment, a fine equal to the amount embezzled, and the costs of the prosecution of the case. The 8th Circuit Court of Appeals said: 'This judgment was erroneous. The statutes gave to the court below no power to add to the fine prescribed by the act of congress the costs of the prosecution of the case. * * * The result is that, while there was no error in the receipt and acceptance of the defendant's plea of guilty, the judgment rendered thereon was not warranted by the law.' "[29]

Thus the defendant's counsel have expressly represented to this Court that the Whitworth case stands for the principle that costs cannot be added to a sentence.

---

[24] 28 U.S.C.A. § 822, R.S. § 974, 1 Stat. 277.

[25] United States v. Marshall, 6 Mackey 34, 17 D.C. 34; Harris v. Nixon, 27 App.D.C. 94; Fields v. United States, 27 App.D.C. 433.

[26] 233 F. 201.

[27] 114 F. 302.

[28] 4 Cir., 233 F. 201, 207.

[29] 8 Cir., 114 F. 302, 304-5.

964

Counsel have further bluntly asserted that the 4th Circuit misread the Whitworth case.

At the bottom of the same page in the Federal Reporter where counsel closed their quote from the Whitworth case, the following appears:

"Since the above opinion was announced, the attention of the court has been called for the first time to section 974 of the Revised Statutes, which provides: [quoting the statute which we have quoted above].

"This statute undoubtedly empowered the court below to adjudge that the defendant, Whitworth, should pay the costs of the prosecution, and, if this provision of the acts of congress had been called to our attention, the judgment below would not have been reversed on account of the imposition of the costs. Meanwhile the case has been remitted to the court below, and the defendant has probably been re-sentenced pursuant to our direction. No motion for a rehearing has been made, and no injustice has resulted from our decision, because the conviction was not disturbed. The former sentence was very severe, and the presumption is that a just sentence has been imposed since our mandate issued. For these reasons the judgment will be allowed to stand, notwithstanding the fact that section 974 undoubtedly empowers the trial judge to award that the defendant shall pay the costs of the prosecution when he is convicted of any offense not capital." [30]

This definite, but incorrect, representation by defendant's counsel to this Court of what the case stands for requires our notice and the expression of our hope that it was done inadvertently. Yet, it is illustrative of defense counsel's tenacious adherence to technical arguments at the trial and in this Court. With this we pass it by.

### Viewing the Case as a Whole.

The questions of construction that have been presented here may be summarized by saying that the alleged looseness of the Act, the regulations, and the form, is not sufficient to allow a willful evader to succeed in a technical claim that he has not been legally brought to task. The evidence presented against the defendant is strong and he has no quarrel with its sufficiency. His disputes with the evidence result from his interpretations on the questions of law. On the questions of law we hold that the trial court's constructions were correct. The asserted errors concerning the procedure at the trial either are nonexistent or appear small and nonprejudicial in their proper perspective. It is clear that we should affirm.

Affirmed.

---

[30] Id., 114 F. at pages 305–6.