# VIERECK *v.* UNITED STATES.

No. 458.   Argued February 1, 2, 1943.—Decided March 1, 1943.

*Mr. O. R. McGuire* for petitioner.

*Assistant Attorney General Berge,* with whom *Solicitor General Fahy* and *Messrs. Oscar A. Provost* and *Andrew F. Oehmann* were on the brief, for the United States.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Petitioner was convicted on three counts of an indictment, each charging him with the willful omission to state a material fact required to be stated in a supplemental registration statement filed by him with the Secretary of State, in violation of the penal provisions of the Act of June 8, 1938, 52 Stat. 631, as amended by the Act of August 7, 1939, 53 Stat. 1244, requiring the registration of certain agents of foreign principals. The question decisive of petitioner's challenge to the validity of his conviction is whether the statute or any authorized regulation of the Secretary required the statement which petitioner omitted to make.

Section 2 of the Act of 1938, as amended, provides that every person acting as "agent of a foreign principal," either as public-relations counsel, publicity agent or representative, with exceptions not now relevant, must file with the Secretary of State a registration statement, on a form prescribed by the Secretary, containing certain specified items of information. These include a copy of the registrant's contract with his principal, or a statement of its terms and conditions if oral, the compensation to be paid under the contract, and the names of all who have contributed or promised to contribute to the compensa-

tion. Beyond the terms and conditions of the registrant's contracts with foreign principals, the statute made no requirement that the original registration statement contain any information as to the registrant's services or activities either in performance of his contract of employment or otherwise.

By § 3 every registrant is required to file at the end of each six months' period, following his original registration, a supplemental statement "on a form prescribed by the Secretary, which shall set forth with respect to such preceding six months' period—(a) Such facts as may be necessary to make the information required under section 2 hereof accurate and current with respect to such period," and "(c) A statement containing such details required under this Act as the Secretary shall fix, of the activities of such person as agent of a foreign principal during such six months' period." And by § 6, "The Secretary is authorized and directed to prescribe such rules, regulations, and forms as may be necessary to carry out this Act." Section 5 imposes penal sanctions upon "any person who willfully fails to file any statement required to be filed under this Act, or in complying with the provisions of this Act, makes a false statement of a material fact, or willfully omits to state any material fact required to be stated therein."

In purported conformity to the statute, the Secretary, on September 15, 1939, promulgated regulations and prescribed a form of "Supplemental Registration Statement." Chapter IV, regulation 12, of the regulations provided: "Agents of foreign principals who engage, whether or not on behalf of their foreign principal, in activities not included among the exceptions set forth in the act and regulations shall be considered subject to the requirement of registration." The prescribed form of Supplemental Registration Statement directed the registrant to make a statement giving certain items of information, No. 11 of

which was "Comprehensive statement of nature of business of registrant."

The three counts of the indictment on which petitioner was convicted charged that in three successive supplemental registration statements filed by him on April 23, 1940, October 25, 1940, and April 25, 1941, as the agent of German principals, he had knowingly and willfully failed to disclose, in response to item 11 which called for a "Comprehensive statement of nature of business of registrant," numerous activities in which he had engaged during the period covered by the supplemental registration statement. On the trial it appeared that petitioner, on September 26, 1939, had registered as agent and United States correspondent for the *Münchner Neueste Nachrichten*, a Munich newspaper, and had later lodged with the State Department a copy of his contract, dated September 27, 1939, as agent and editorial writer for the German Library of Information, an agency of the German government, to do editorial work in connection with "Facts in Review," a publication of the Library. On March 17, 1941, petitioner registered his contract, with a person associated with the Munich newspaper, to act as agent for the publication in the United States of a book "The One Hundred Families Who Rule Great Britain."

There was also evidence from which the jury could have found that during the eighteen months' period covered by petitioner's three supplemental registration statements, and from August 3, 1940, he had controlled and financed Flanders Hall, a corporation which published numerous books and pamphlets from manuscripts furnished by petitioner; that it had also published other books furnished by petitioner which purported to be English translations of French or Dutch publications, or to have been compiled from English sources, but which were in fact translations of German books published by the

*Deutsche Informationsstelle* of Berlin. All were highly critical of British foreign and colonial policy. During this period petitioner actively participated in the formation of the "Make Europe Pay War Debts Committee," and the "Islands for War Debts Committee," and made use of these organizations as a means of distributing propaganda through the press and radio and under Congressional frank. He also consulted with and was active in writing speeches for various members of Congress, and in securing distribution of the speeches under Congressional frank.

In making the statement required by item 11 in each of his three supplemental registration statements, petitioner responded to the request for a comprehensive statement of the nature of his business by the single phrase "Author and journalist." He made no further disclosure of his various activities during the period covered by the supplemental registration statements.

When submitting the case to the jury, the trial court, at the Government's request, charged that "if you find that the defendant engaged in the activities set forth in the indictment, it is not necessary that you find that he engaged in such activities on behalf of his foreign principal or principals. It is sufficient if you find that he engaged in the activities, whether on behalf of his foreign principal or principals or on his own behalf." On appropriate objection and exception to this instruction, petitioner contended that under the statute he was not required to disclose his activities on his own behalf but only those for foreign principals. The jury returned a verdict of guilty, the judgment of conviction was affirmed by the Court of Appeals for the District of Columbia, 130 F. 2d 945, and we granted certiorari. 317 U. S. 618.

As the charge left the jury free to return a verdict of guilty if it found that petitioner had willfully failed to disclose activities which were wholly on his own behalf,

the conviction can be sustained only if the failure to disclose such activities was a criminal offense. In its brief and on the argument here the Government accordingly conceded that—even though the evidence might warrant a jury's finding that all petitioner's activities were in fact in behalf of his foreign principals—the conviction cannot stand if the charge was erroneous. See *Williams* v. *North Carolina,* 317 U. S. 287, 292; *Pierce* v. *United States,* 314 U. S. 306, 310. We are thus brought to the question whether the statute, supplemented by the regulations of the Secretary, required such information to be given and imposed penal sanctions for petitioner's willful failure to give it.

The Act of 1938 requiring registration of agents for foreign principals was a new type of legislation adopted in the critical period before the outbreak of the war. The general purpose of the legislation was to identify agents of foreign principals who might engage in subversive acts or in spreading foreign propaganda, and to require them to make public record of the nature of their employment. But the means adopted to accomplish that end are defined by the statute itself, which, as will presently appear more in detail, followed the recommendations of a House Committee which had investigated foreign propaganda. These means included the requirement of registration of agents for foreign principals—with which it appears that petitioner complied—and the requirement that the registrant give certain information concerning his activities as such agent.

One may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress. *United States* v. *George,* 228 U. S. 14, 20–22; *Williamson* v. *United States,* 207 U. S. 425, 453–62; *United States* v. *Standard Brewery,* 251 U. S.

210, 219–20; *United States* v. *Eaton*, 144 U. S. 677; *United States* v. *Grimaud*, 220 U. S. 506; *United States* v. *Smull*, 236 U. S. 405; *In re Kollock*, 165 U. S. 526. Penal sanctions attach here for willful failure to file a statement when required, or if the registrant "willfully omits to state any material fact required to be stated." Unless the statute, fairly read, demands the disclosure of the information which petitioner failed to give, he cannot be subjected to the statutory penalties.

It is to be noted that although the statute required registration of contracts already entered into at the time of its adoption, it did not include, in its enumeration of information to be given in the original registration statement, any disclosure of a registrant's activities either under his agency contract or otherwise. And the only mention in the statute of a statement of such activities is in § 3 (c), which directed that supplemental registration statements contain "such details required under this Act as the Secretary shall fix, of the activities of such person as agent of a foreign principal." The requirement of this section is subject to two limitations. One is that the statement is to be of such details of the registrant's activities "as the Secretary shall fix"; the other is that the details are to be of activities of the registrant "as agent of a foreign principal."

Neither limitation can be disregarded in determining what statement the statute, and any regulation which it authorizes the Secretary to promulgate, called on petitioner to make. The Secretary's regulation 12 of chapter IV, already quoted, on which the Government relies, plainly does not call for any statement of a registrant's activities. It only declares that agents who engage in activities "whether or not on behalf of their foreign principal" are subject to registration. It requires no statement of their activities and adds nothing to the command of §§ 2 and 3 that all agents of foreign principals shall

register, a requirement with which petitioner complied. Whatever the undisclosed purpose of this regulation, a fair reading of it would not indicate to a registrant that it required any statement of his activities in any capacity.

But treating item 11 of the Supplemental Registration Statement ("Comprehensive statement of nature of business of registrant"), prescribed by the Secretary, as a regulation fixing the details of the registrant's activities which he is required to state, it must either be taken as limited to a statement of his activities as agent, to which § 3 (c) alone refers, or to exceed the authority conferred upon the Secretary by that section. In neither case does the statute command, or authorize the Secretary to command, registrants to make any statement of their activities other than those in which they have engaged "as agent."

We cannot read that phrase as though it had been written "while an agent" or "who is an agent." The unambiguous words of a statute which imposes criminal penalties are not to be altered by judicial construction so as to punish one not otherwise within its reach, however deserving of punishment his conduct may seem. Nor is such an alteration by construction aided by reference to § 6, which directs the Secretary to prescribe rules and regulations "to carry out this Act." For, as we have seen, the only provision of the Act relating to statements of the registrant's activities is § 3 (c), which defines its own and the Secretary's limitations. Section 6 does not give to the Secretary any authority not to be found in the Act, and especially not an authority which overrides the specific limitations of § 3 (c).

While Congress undoubtedly had a general purpose to regulate agents of foreign principals in the public interest by directing them to register and furnish such information as the Act prescribed, we cannot add to its provisions other requirements merely because we think

they might more successfully have effectuated that purpose. And we find nothing in the legislative history of the Act to indicate that anyone concerned in its adoption had any thought of requiring, or authorizing the Secretary to require, more than a statement of registrants' activities in behalf of their foreign principals.

In 1935 the McCormack committee, reporting on its Investigation of Nazi and Other Propaganda, recommended: "That the Congress should enact a statute requiring all publicity, propaganda, or public-relations agents or other agents or agencies, who represent in this country any foreign government or a foreign political party or foreign industrial or commercial organization, to register with the Secretary of State of the United States, and to state name and location of such foreign employer, the character of the service to be rendered, and the amount of compensation paid or to be paid therefor." H. R. Rep. No. 153, 74th Cong., 1st Sess., p. 23. The House and Senate committee reports, urging enactment of the McCormack bill which became the 1938 Act, both declare that its purpose was to carry out these recommendations of the McCormack committee. H. R. Rep. No. 1381, 75th Cong., 1st Sess., p. 1; S. Rep. No. 1783, 75th Cong., 3d Sess., p. 2.

As may be seen from the text which we have quoted, these recommendations were limited to the proposal of specific measures for achieving the committee's general purpose, by requiring disclosure of the identity of the agent and of his foreign principal and the agent's relationship to the principal. They give no hint of an intention to require agents to disclose activities not in behalf of their foreign principals. And in supporting the amendatory legislation enacted in 1942, which, among other additions, required registrants to make "a comprehensive statement of the nature of registrant's business" (Act of April 29, 1942, § 2 (a) (3)), Representative McCormack stated:

"The present bill strengthens the McCormack Act. I was experimenting at that time, and, naturally, when you are experimenting you cannot go as far as you can after you have had experience, and in the light of the experience gained from the administration of the McCormack Act, these amendments are necessary to strengthen the Act for the best interests of our country." 88 Cong. Rec., Jan. 28, 1942, p. 802.

Even though the specific restriction of § 3 (c) were due to defective draftsmanship or to inadvertence, which hardly seems to be the case, men are not subjected to criminal punishment because their conduct offends our patriotic emotions or thwarts a general purpose sought to be effected by specific commands which they have not disobeyed. Nor are they to be held guilty of offenses which the statutes have omitted, though by inadvertence, to define and condemn. For the courts are without authority to repress evil save as the law has proscribed it and then only according to law.

The Government argues that the statute would have been a "halfway measure" had it not required, or at least authorized the Secretary to require, the registrant to reveal the propaganda which he put out other than on behalf of his foreign principal. Congress itself has recognized that the legislation was in this sense a halfway measure when in 1942 the Act was amended so as to require both original and supplemental registration statements to contain a "comprehensive statement of the nature of registrant's business," together with other specifically required information as to the character of registrants' activities. Act of April 29, 1942, c. 263, 56 Stat. 248, §§ 2 (a) (3), 2 (a) (4), 2 (a) (8), 2 (a) (10), 2 (b).

The Senate Judiciary Committee in recommending the 1942 legislation said that "the present Act is also improved by explicit enlargement of the registration provisions so as to render them more efficacious for disclosure and investi-

gative purposes." S. Rep. No. 913, 77th Cong., 1st Sess., p. 9. The House Judiciary Committee declared "the existing law is also believed to have been bolstered by explicit enlargement of the registration provisions so as to render them more efficacious for disclosure and investigative purposes. . . . All of these additions have been prompted by experience in cases under the present act." H. Rep. No. 1547, 77th Cong., 1st Sess., pp. 3–4.[1]

---

[1] This statement, which omitted to point out that the activities referred to in § 3 (c) were the registrant's activities "as agent," was copied verbatim from a statement which had been submitted at a hearing on November 28, 1941, by the Chief of the Special Defense Unit of the Department of Justice, who had a large share in drafting the 1942 legislation. See Hearings before Subcommittee No. 4 of the House Committee on the Judiciary, 77th Cong., 1st Sess., on H. R. 6045, pp. 26, 12. There is some language in his statement, also copied in the House Report at p. 4, which may indicate that the Department of Justice thought that the existing law required disclosure of "information about the nature of the registrant's business," and that the provision in the 1942 law would be "declaratory." If such was its meaning, the statement ignored and did not point out to the committee the explicit limitation of § 3 (c) of the old Act to the registrant's activities "as agent." Moreover, the statement was submitted by the Department after the institution of the prosecution of this case (the indictment was filed October 8, 1941). Hence in some measure it may have represented the Department's view of the law, which we think inadmissible, reflected in its requested charge to the jury in this case.

A like indefiniteness as to the extent to which the new legislation might be regarded as declaratory is suggested by the letter of the Attorney General of November 24, 1941, recommending the new legislation to the chairmen of the Senate and House Judiciary Committees. The Attorney General, however, seems to have thought that the provisions of the new bill would be declaratory, not of the provisions of the old Act, but of the "requirements of the registration statement of foreign agents as now prescribed or may be prescribed by the Secretary." Indication that the Attorney General did not regard the Act, before the 1942 amendment, as embodying this requirement of the Secretary is to be found in the first paragraph of his letter: "Under existing law, every person who is an agent of a foreign principal is required to file a registration statement with the Secretary of State, setting forth certain

While we find in the committee reports no mention of the explicit restriction of the application of § 3 (c) of the old Act to the registrant's activities "as agent," the reports reveal a clear purpose to make the registration requirements of the new Act extend to all his activities.[2] We think that in this respect the new Act extends beyond the old, and that the application, *ex post facto,* of the new, to impose on petitioner a duty which the words of the old plainly exclude, is not to be justified by denominating the amendment as clarifying or declaratory legislation.

As the case must be remanded to the district court for further proceedings, we direct attention to conduct of the prosecuting attorney which we think prejudiced petitioner's right to a fair trial, and which independently of the error for which we reverse might well have placed the judgment of conviction in jeopardy. In his closing remarks to the jury he indulged in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice.[3] The trial judge overruled, as coming too late,

---

information disclosing the nature of his relationship to such foreign principal." Hearings, *supra,* pp. 55–56; S. Rep. No. 913, 77th Cong., 1st Sess., pp. 10–11.

[2] The committee reports referred to are reports on H. R. 6269, which was passed by Congress, but vetoed by the President because our entrance into the war had made it necessary to alter the bill in certain respects, not material here. A new bill, S. 2399, containing such changes, became the Act of April 29, 1942. See S. Rep. No. 1227, 77th Cong., 2d Sess.; H. R. Rep. No. 2038, 77th Cong., 2d Sess.

[3] "In closing, let me remind you, ladies and gentlemen, that this is war. This is war, harsh, cruel, murderous war. There are those who, right at this very moment, are plotting your death and my death; plotting our death and the death of our families because we have committed no other crime than that we do not agree with their ideas of persecution and concentration camps.

"This is war. It is a fight to the death. The American people are relying upon you ladies and gentlemen for their protection against this sort of a crime, just as much as they are relying upon the protection

petitioner's objection first made in the course of the court's charge to the jury.

At a time when passion and prejudice are heightened by emotions stirred by our participation in a great war, we do not doubt that these remarks addressed to the jury were highly prejudicial, and that they were offensive to the dignity and good order with which all proceedings in court should be conducted. We think that the trial judge should have stopped counsel's discourse without waiting for an objection. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *United States,* 295 U. S. 78, 88. Compare *New York Central R. Co.* v. *Johnson,* 279 U. S. 310, 316–18.

*Reversed.*

MR. JUSTICE JACKSON and MR. JUSTICE RUTLEDGE took no part in the consideration or decision of this case.

---

of the men who man the guns in Bataan Peninsula, and everywhere else. They are relying upon you ladies and gentlemen for their protection. We are at war. You have a duty to perform here.

"As a representative of your Government I am calling upon every one of you to do your duty."

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

The petitioner, having registered with the Secretary of State as a foreign agent, was convicted of willful refusal to inform the Secretary of certain business activities in which he systematically attempted to influence the political thought of this country on behalf of Germany. The trial judge charged the jury not to convict the petitioner unless he had actual knowledge that the Act and the regulations required him to supply this information to the Secretary, and that having such knowledge he had refused to answer the Secretary's question with the "deliberate intention of avoiding the requirement of the statute." The jury found, and it is not questioned here, that the petitioner was a paid German propagandist engaged in various business activities, in all of which he made use of the same kind of propaganda calculated to further the interests of Germany in the United States. The Court holds that the Congressional enactment required petitioner to reveal to the Secretary only the particular propaganda activities in which he engaged pursuant to his agency. It holds that the petitioner could keep secret, without violating the law, those propaganda activities undertaken on his own behalf, which were of exactly the same type and were intended to accomplish exactly the same purpose as those for which he had been hired by his German principals.

To this construction of the Act I cannot agree. I think that § 3 (c) of the Act, which authorizes the Secretary to require statements "of the activities of such person as agent of a foreign principal" must be read in the light of the general purpose of the Act and in close connection with § 6, which permits the Secretary to prescribe the "rules, regulations, and forms" necessary to carry out the

Act. By such a reading, the Secretary was authorized to ask the question the petitioner failed to answer.

The general intent of the Act was to prevent secrecy as to any kind of political propaganda activity by foreign agents. Both the House and Senate Committees reporting the Bill under consideration declared it to be their purpose to turn "the spotlight of pitiless publicity" upon the propaganda activities of those who were hired by foreign principals. Appreciating that "propaganda efforts of such a nature are usually conducted in secrecy," they wanted to make full information concerning it "available to the American public" and sought by "the passage of this bill" to "force propaganda agents representing foreign agencies to come out 'in the open' in their activities, or to subject themselves to the penalties provided in said bill." [1] They declared that the purpose of the Bill was to require all such hired agents "to register with the State Department and to supply information about their *political activities,* their employers, and the terms of their contracts." [2]

---

[1] Senate Report No. 1783, House Report No. 1381, 75th Cong., 3d Sess.

[2] The House Committee hearings, which are available in manuscript form only, show the same broad purpose. In explaining the Bill to the House Committee, its author pointed out that it was particularly aimed at firms, groups, or businesses, used "as a means for that particular country or political party to hide its identity" and that the Bill covered "all activities of all kinds, that is, all propaganda activities, no matter from what source it emanates." The Congressional Committee, whose Chairman was the author of this Bill, had discovered through hearings, that business enterprises had been utilized as a means for propagandizing, and that many persons including the petitioner here had published articles in various magazines, concealing their identity behind pseudonyms. The purpose of these activities, the Committee found, had been to influence "the policies, external and internal, of this country, through group action. They were employing the same method that they had employed in Germany for the purpose of obtaining control of the government over there."

What emerged from extended Congressional investigations, hearings and deliberations was this Act, intended to provide an appropriate method to obtain information essential for the proper evaluation of political propaganda emanating from hired agents of foreign countries. As the House and Senate Committees considering the Bill said, it "does not in any way impair the right of freedom of speech, or of a free press, or other constitutional rights." Resting on the fundamental constitutional principle that our people, adequately informed, may be trusted to distinguish between the true and the false, the bill is intended to label information of foreign origin so that hearers and readers may not be deceived by the belief that the information comes from a disinterested source. Such legislation implements rather than detracts from the prized freedoms guaranteed by the First Amendment. No strained interpretation should frustrate its essential purpose.

Section 6 of the Act provides that "The Secretary is authorized and directed to prescribe such rules, regulations, and forms as may be necessary to carry out this Act." Congress did not set out in the Act the questions to be answered, and it surely did not intend to entrust the Secretary with no more than the power to copy the Act in seeking information. Such latitude as he has, the Secretary immediately used to require that "agents of foreign principals who engage, whether or not on behalf of their foreign principal," in political propaganda activity should register; and he asked the registrants to make a "comprehensive statement of nature of business." In view of the general purpose of the Act, such a question seems eminently reasonable. As a practical matter, the very fact that in the instant case it is extremely difficult to determine with conviction which activities the petitioner carried on in his own behalf and which he carried on in behalf of Germany is reason enough for requiring

him to report on both. The Act did not contemplate that a foreign agent could evade its terms by claiming that all unreported political activities, upon their discovery by this government, were undertaken on his own behalf. Under the general power given the Secretary by § 6 to determine the form of questions, he was entitled to ask such questions as would make the enforcement of § 3 (c) possible. I think the Secretary was authorized to ask the question under consideration in this case and that the Act required the petitioner to answer it.

As is pointed out in the opinion of the Court, the 1942 amendment to the Act explicitly authorizes the Secretary to ask the question which is involved in the instant case. The addition of this provision to the Act, however, I consider purely declaratory. The 1942 Bill was passed, as shown by the Senate and House reports, to serve four major purposes: It required the labeling of foreign propaganda mailed in the United States; transferred the administration of the Act from the Department of State to the Department of Justice; extended the application of the Act to certain propaganda affecting Latin America; and improved the enforcement provisions. The Attorney General, in expressing his views on the bill, declared that the registration provisions of the amendment, which includes specific authorization to ask the very question now before us, were "merely declaratory." [3] If so, the Secretary had the authority to ask the same question under the 1938 Act.

The reversal here apparently does not rest on the concluding remarks of counsel for the government set forth in the Court's opinion. I am in accord with the sentiments expressed in *Berger* v. *United States,* 295 U. S. 78, 88, which the Court today repeats. In that case the Court declared that counsel had misstated the facts; put words

---

[3] Sen. Report No. 913, 77th Cong., 1st Sess.

into the mouths of witnesses which they had not said; intimated that statements had been made to him personally out of court in respect of which no proof was offered; pretended to understand that a witness had said something which he had not; bullied and argued with the witnesses; and committed other offenses. This Court properly declared that his conduct called for stern rebuke by the trial judge, for repressive measures, and "perhaps, if these were not successful, for the granting of a mistrial."

A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows.[4]

---

[4] "To shear him [the prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted." *Di Carlo* v. *United States*, 6 F. 2d 364, 368.