## PRITCHETT v. UNITED STATES.
### No. 10544.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 5, 1950.

Decided Nov. 9, 1950.

Mr. James J. Laughlin, Washington, D. C., for appellant. Mr. William E. Owen, Washington, D. C., also entered an appearance for appellant.

Mr. John D. Lane, Asst. U. S. Atty., Washington, D. C., with whom Messrs. George Morris Fay, U. S. Atty., and Richard M. Roberts and Joseph M. Howard, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee.

Before CLARK, PRETTYMAN and PROCTOR, Circuit Judges.

CLARK, Circuit Judge.

The appellant was found guilty of murder in the first degree by a jury in the United States District Court for the District of Columbia pursuant to Sec. 798, D.C.Code (1901), as amended, 22 D.C.Code § 2401 (1940), and has been sentenced to death.

The deceased, Clyde L. King, was an engineer on the B. & O. Railroad, who lived with his wife and eight year old grandson. The appellant was a roomer in the King home.

The deceased started working Saturday night, July 9, 1949, at midnight, and shortly before 1 A.M. Sunday he left his switch engine and did not return until about 2 A.M. On Saturday the appellant had taken Mrs. King and her grandson to a neighborhood party and on their return he parked two doors away from the King home. It was testified that the deceased went over to the appellant's car shouting an oath and stating, "I told you not to take her out."

Further testimony showed that the deceased pulled the appellant out of his automobile and struck him in the face. King's grandson testified that harsh words had passed between the deceased and the appellant. After the altercation King walked to the corner and returned to the car to check on his wife whose condition so disgusted him he left for the railroad yard. Neighbors put Mrs. King and the little boy to bed and testified the appellant was still there about 2:20 A.M. One of the boys who had helped put Mrs. King in the house testified that the appellant had pulled a gun from his right hip pocket. All three of these boys testified the appellant, when asked what he was going to do, had said, "he would take care of everything." After the conversation the appellant re-entered the house and shortly thereafter drove off alone in his car.

The appellant next appeared in Wilson's Grill about 3 A.M. looking for Mr. King, and he left when he did not find him. The deceased had returned to his switch engine about 2 A.M. and at 3 A.M. was signaled to back up. The train began to move but stopped so abruptly that the cars ran into the engine. Following "very closely" thereafter the crew heard several explosions.

The fireman was seated on the left side of the cab opposite the deceased's position. A five or six-foot space separated their seats. Access was gained to the cab only by an open door frame from a narrow rear platform. Steps, on both sides, lead to the ground from the rear platform.

The fireman heard King talking out of the right window to some one on the ground, and the appellant admitted calling up to King, to ascertain King's identity. In a "matter of seconds" after the conversation the fireman heard a "series of explosions", but he testified he never saw the assassin and did not turn until he heard King moan and even then thought the moaning was just a joke.

Three other B. & O. crewmen were not alarmed by the "series of explosions" as they were accustomed to the use of explosions in jest in the yards and as signals on the main line. But the sudden stop brought them to the engine as they thought it had jumped the track. The yard foreman saw the appellant walk down the steps of the rear platform with his right hand under the bib of his overalls. When this foreman reached the deceased, the foreman's watch disclosed it was five past 3 A.M. The appellant walked past all three crew members and admitted seeing the last of the three. The appellant was seen leaving the railroad yard, and at about 3:30 A.M. he was seen entering the King home. The appellant admits being in the engine and admits tossing the weapon on the tracks. He was arrested at 3:45 A.M. the same day.

There were seven wounds with their entrance all in a downward direction from left to right. This indicated the weapon was discharged from above the deceased as would have been the case if the weapon had been fired by one standing on the rear platform of the switch engine. The lack of powder marks indicated the weapon was held more than eighteen inches from the deceased. The billfold and overalls of the appellant indicated that the weapon was discharged from inside his overalls.

When the appellant took the stand his counsel brought out that he had served twelve and one-half years in Virginia for second degree murder.

The appellant contends unless the evidence is clear and convincing, and excludes any hypothesis except that of guilt, the jury should not be permitted to guess and speculate, and the court should, as a matter of law, have taken the case from the jury on his motion for a directed verdict. Judge Prettyman in Curley v. U. S., 1946, 81 U.S.App.D.C. 389, 160 F.2d 229, 232 which is cited and quoted by appellant, discussed this point. In that case this court held: "The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."

■ In the light of this rule and the facts of this case, we cannot but feel that the trial court was correct in refusing to take this case from the jury. The evidence was strong and included direct and circumstantial evidence of motive, of design to kill, of exclusive opportunity and of consciousness of guilt.

■ The appellant next contends that the trial court failed adequately and completely to instruct the jury. This contention is completely without merit. A careful reading of the trial court's instructions discloses that first and second degree murder, manslaughter, self-defense, malice aforethought, reasonable doubt, etc., were carefully discussed by the court. Defense counsel must have felt this to be true after the charge was delivered as he made only a general objection to the charge. And before this court appellant only claims one specific error in the charge, and that is, with reference to the court's statement that "Now of course you are fairly familiar with the testimony of the defense in this case, and I am not going to call it self-defense because under the specific testimony of the defendant, he didn't kill the deceased at all."

This statement unsupported by the appellant's own assertion might have prejudiced his case, but the appellant did testify that he did not kill the deceased. The deceased had possession of the gun and in grappling for the weapon the appellant contends it went off and killed King. But despite the appellant's own testimony the court gave the appellant the benefit of instructions on self-defense. For this reason the rule cited by the appellant in Meadows v. U. S., 1936, 65 App.D.C. 275, 82 F. 2d 881 is inapplicable.

The appellant next contends that as a result of the instructions the jury was confused and in doubt with regard to the principles of law applicable to this case. That there was some confusion in the minds of the jury is illustrated by their request for an amplification of the instructions. The court answered all the jurors' questions as fully as possible, and before the jury again retired all the jurors indicated they were satisfied. Defense counsel thereupon stated that he was not satisfied and felt the need of additional instructions, but in view of the instructions given we quite agree with the trial judge that "further instructions would simply confuse the whole situation."

The final contention made by the appellant is that the argument of the Assistant United States Attorney was inflammatory and was not supported by the evidence in the case. The appellant complains of the following language in the prosecuting attorney's closing argument: "Also, is there anything between the defendant and the deceased's wife? * * * was there anything between those two? Also, her testimony from the stand was volunteer testimony and was damaging to her husband. Why? To help the defendant. Did she appear to you to be at all sorrowful that this defendant killed her husband? She didn't to the Government."

■ Counsel in their closing arguments are given wide latitude but there must be a basis of fact for such assertions. A Government witness had testified that the deceased had shouted, "You son of a bitch, I told you not to take her out."

The testimony of the wife of the deceased did tend to aid the appellant, and although there is nothing wrong with her so doing, it is a subject for comment in the closing argument by counsel. Her attitude on the stand had been observed by the jury and was certainly subject to comment by counsel for both parties. This was ample testimony on which the Government could base such a closing statement. We do not find the prosecuting attorney's language unsupported by the evidence or so inflammatory as would bring it within the rule laid down in Viereck v. U. S., 1943, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734, cited in appellant's brief.

■ The appellant asserts that the prosecutor may not impeach his own witness by such argument and with this we agree. But the prosecutor is not precluded from presenting other evidence which varies from or contradicts such a witness and then he may comment unfavorably on the testimony of such a witness in his closing argument. Thomas v. State, 1921, 206 Ala. 416, 90 So. 295, 296.

Affirmed.