CONGREGATION OF THE SONS OF ISRAEL AND DAVID *vs.*
DIRECTOR OF PUBLIC WORKS.

MARCH 19, 1962.

PRESENT: Condon, C. J., Roberts, Paolino, Powers and Frost, JJ.

FROST, J. ·This is a petition for the assessment of damages for real estate and improvements thereon pursuant to G. L. 1956, §24-10-2, and chapter 6 of title 37. It was tried before a justice of the superior court sitting with a jury and resulted in a verdict for the petitioner in the sum of $89,350. Thereafter the petitioner moved for a new trial on the usual grounds, together with the additional grounds that the verdict failed to give petitioner just compensation and to do substantial justice and also that the jury was influenced by respondent's appeal to racial and religious prejudice. The trial justice denied the motion and the petitioner has prosecuted a bill of exceptions to this court excepting thereto and also to certain rulings made during the trial.

The only exception briefed and argued in this court is to the denial of the motion for a new trial. All other exceptions are deemed to have been waived. *Fraraccio* v. *Progress Ice Cream Co.*, 77 R. I. 315.

Just prior to August 7, 1957, the date on which the land was condemned, petitioner, commonly known as Temple Beth El, owned in fee simple a tract of land containing 7.29 acres in the city of Providence, which it used as a cemetery with its main entrance at 400 Reservoir avenue. It had owned a small portion of this land for approximately one hundred years but the larger part of it had been acquired on various later dates. Of the total area, 3.29 acres enclosed by an iron fence had been developed for cemetery purposes, 2.3 acres of which had already been used for interments with approximately .9 of an acre of developed land still unused at the time of condemnation. None of the 3.29 acres was condemned by the state.

The portion of the total 7.29 acres which was condemned or affected by the condemnation was an area of approximately 4 acres of undeveloped land intended ultimately to be used for cemetery purposes; and also an area of 4,800 square feet with a small diner thereon, which land was rented at a monthly rental of $80. The only building condemned was a one-story cement block office and maintenance building 36 by 26 feet containing office and toilet facilities, a heating plant and storage area.

It appeared that a new schedule of prices for cemetery lots became effective on September 1, 1956. A single lot was $160, an advance of $60 over the former price, and did not include perpetual care. Sales were restricted to members of the congregation. A single lot was commonly 4 by 10 feet or 40 square feet, which meant about 800 to the acre since some land was devoted to paths and shrubbery.

Sales were conducted on a nonprofit basis. No salesmen were employed and no effort was made to sell lots on a pre-need basis. There was an average sale of about thirty a

year for the three years preceding 1955 when a brochure was printed and a mild effort made to promote further sales. This resulted in the sale of 172 in two years.

Testimony relating to the value of the cemetery land was given on behalf of petitioner by Daniel C. Hanrahan of New Jersey, Michael A. Fitzpatrick and Richmond B. Bullock, Jr. both of this state, and for respondent by William E. Coyle, Jr. and Peter A. Laudati, Jr., both of this state.

Mr. Hanrahan testified that he had appraised cemeteries in a number of eastern and midwestern states. He thought that the fair value of petitioner's land was not truly reflected in the history of sales as made by it on the nonprofit basis and that the best potential use would involve offers to sell to all members of the Jewish faith without regard to whether they were members of the congregation of Temple Beth El. He believed that if the opportunity to purchase was open to all members of the Jewish faith and there was a willingness to incur a reasonable selling expense and development cost, all of the remaining lots could reasonably be sold within four and one-half years. Mr. Hanrahan found the value of the land taken to be $232,800 and that of the building $7,600. He gave a credit of $1,400 for land severed but not taken and therefore reached a final figure of $239,000.

Mr. Fitzpatrick at the time of testifying had had thirty years' experience in real estate which did not include appraisal of any cemetery. He thought that, since a lot 10 by 4 feet was selling for $150 or $3.75 a square foot, a willing buyer would pay $1.25 per square foot, or for 143,000 square feet of condemned land which did not include the diner site the sum of $178,700. Upon a portion of land that was condemned but which could not be used, he placed a value of $27,500. Upon the piece of land on which the diner was, he placed a valuation of $13,700 together with $7,500 as the value of the maintenance and office building. Group-

ing these sums together he gave for the total damages the sum of $227,400.

Mr. Bullock testified to fifteen years' experience in selling and appraising real estate. He stated that the best use of all of the property would be for cemetery purposes. He placed a value of $214,339.90 upon the land and $7,200 upon the office and maintenance building, or a total of $221,-539.90 upon the property taken.

Mr. Coyle testified that he had had some familiarity with cemetery values since his father-in-law was a cemetery superintendent, although he had never before appraised cemetery property. He considered that each acre would yield approximately 800 lots and that approximately 100 would be sold each year. He figured $150 as the sale price of a lot, less $25 per lot as development costs. He estimated it would require forty years to sell all the lots. His final figure for petitioner's loss was $67,700.

Mr. Laudati testified that he had had considerable experience in the appraisal of real estate although he had not previously appraised any cemetery. He assumed as facts that the total cemetery property was 7.29 acres; that the land taken was 3.4 acres and land severed .6 of an acre; that one acre would yield 625 lots, 4 by 10 feet each; that each lot would sell for $150; that development and selling expense would be $30 per lot; and that about 100 lots would be sold annually. He arrived at the figure of $65,300 as the total condemnation damages.

The evidence showed only a small number of sales each year, and the evidence also indicated that at the time of condemnation no strong desire to change the method of selling was being followed. From these facts it may well have seemed to the jury that the figures given by witnesses Coyle and Laudati were the more realistic. It, too, must have been evident to the jury that there was no disposition on the part of the members of Temple Beth El to open the cemetery to Jewish people generally.

These facts may have furnished reasons which caused the jury to accept the figures given by respondent's witnesses rather than those given by petitioner's experts. The jury's final assessment, while considerably lower than the figures testified to by petitioner's experts, was considerably higher than those given by respondent's witnesses. In any event the amount of the assessment was one which the jury could properly reach upon the evidence submitted.

The trial justice in concluding his oral decision on petitioner's motion for a new trial stated, "* * * and this Court, in looking over all the testimony and evaluating and exercising my own independent judgment, and the testimony as I see it, and bearing in mind that I am not swayed as strongly by the majority opinion in the St. Agnes case, I feel that justice has been done between the parties and the motion for new trial should be denied * * *."

The petitioner in its brief presents the following questions: "2. Was the petitioner denied its full constitutional rights by reason of the State's appeal to racial and religious prejudice? 3. Is the petitioner entitled to a new trial notwithstanding the fact that it did not request the trial justice to attempt to mitigate the prejudicial effect of the State's argument?"

The petitioner appears to assume by question 2 that there was an appeal to racial and religious prejudice in respondent's argument to the jury. We have read that argument and do not find it open to the charge here made. The portion referred to by petitioner is as follows:

"Examine the witnesses that have been in this case. We had Mr. Bernhardt, who is Vice-President of Apex. We all know what Apex is and the amount of business they do. You have Mr. Logowitz, who is Treasurer of the Outlet Company. Mr. Levy, who was President of the Bar Association. We all know how the Jewish race is so well adept to business. They have the business ingenuity, the business acumen, they are good businessmen — we don't want to take that away from them—

but doesn't it seem strange that in the 105 years that this cemetery was in existence not one of those shrewd men, not one of those good businessmen was aware of this bonanza? If they could have sold all these lots in four and a half years don't you think they would have done it? They wouldn't have waited for Hanrahan to come in to tell them. These men are businessmen."

While we are of the opinion that it was unwise for respondent's counsel in his argument to use the words "Jewish race" as it is usually unwise to refer in argument to any race by name, yet if in his judgment it was necessary to do so we are of the opinion that he should not be criticized. He did not hold up the Jewish race to ridicule but referred to certain good qualities which he in effect stated the race possessed and made his argument on that. Whatever may be thought about the wisdom of arguing before a jury the qualities possessed by a religious, racial or social group, we are of the opinion that counsel in this case is not open to censure for the reference he made to the Jewish race. However petitioner may feel about the argument to the jury made by respondent's counsel in respect to the special qualities possessed by the Jewish race, no objection was made at the time and no exception was requested or given, and it is not now possible to argue as if an exception had been requested and given at the time. We know of no case in this state and none has been called to our attention where an argument has been permitted which is not based upon an exception given at the time the matter arose. The petitioner cites the following cases from other jurisdictions where such argument was permitted: *People* v. *Simon*, 80 Cal. App. 675; *Gutin* v. *Frank Mascali & Sons*, 22 Misc. 2d (N.Y.) 1038; *Calloway* v. *Fogel*, 358 Mo. 47; *Viereck* v. *United States*, 318 U. S. 236.

It is unnecessary to recite the facts in such cases. All involved language of the plaintiff's attorneys that was so clearly unfair and prejudicial as to admit of no argument.

In each case objection was not made by counsel but by the justice presiding and eventually new trials were ordered. There can be no question that, if in the course of a trial improper remarks or arguments are made by counsel, it is incumbent upon the justice presiding to take appropriate action immediately even though not requested by counsel. It is a duty of the justice to see that the trial over which he is presiding is fair.

The petitioner states in its brief at page 46: "When the State levelled its argument to the jury on the basis of the race and religion of the petitioner and its witnesses in a manner which would inevitably incite dormant prejudices, the harm done was irradicable. The argument was shocking and effective. No request on the part of the petitioner and no instruction from the court could have undone the harm." Notwithstanding this opinion counsel did not ask to have the case passed. If when he listened to the state's argument he felt as he now argues it seems remarkable, to say the least, that he did not so move. A reading of the respondent's argument will show how far it was from being inflammatory or objectionable and how little basis there was for objecting and requesting an exception from the court.

The petitioner's exception to his motion for a new trial is overruled and the case is remitted to the superior court for entry of judgment on the verdict.

*Higgins, Cavanagh & Cooney, Joseph V. Cavanagh, Harold E. Adams, Jr.,* for petitioner.

*J. Joseph Nugent,* Attorney General, *Russell C. King,* Special Counsel, for State, for respondent.