UNITED STATES of America,
Plaintiff,

v.

Robert Archie BERGLAND, Charles El-
mer Cantrell, William Gordon Donahue,
a/k/a Bill Fletcher, Defendants.

No. 62–CR–118.

United States District Court
E. D. Wisconsin.

Sept. 25, 1962.

On Motion for Rehearing Oct. 31, 1962.

James B. Brennan, U. S. Atty., by
William J. Mulligan, Asst. U. S. Atty.,
Milwaukee, Wis., for plaintiff.

Dominic H. Frinzi, Milwaukee, Wis.,
for defendants, Robert Archie Bergland
and William Gordon Donahue.

Gordon A. Borman, Milwaukee, Wis.,
for defendant, Charles Elmer Cantrell.

GRUBB, District Judge.

The defendants in this action are
charged in a three-count indictment with
violations of Sections 2, 371, 1084, and
1952 of Title 18 U.S.C.A.

Briefly, the first count charges
that the defendants conspired and agreed
upon a scheme whereby they would use
a telephone in interstate commerce to
promote a gambling enterprise which in-
volved the placing of bets on horse races.

Section 1084, Title 18 U.S.C.A., pro-
vides in pertinent part as follows:

"(a) Whoever being engaged in
the business of betting or wagering
knowingly uses a wire communica-
tion facility for the transmission in
interstate or foreign commerce of
bets or wagers or information assist-
ing in the placing of bets or wagers
on any sporting event or contest, or
for the transmission of a wire com-

munication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both."

Section 1952, Title 18 U.S.C.A., provides in pertinent part as follows:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

\* \* \* \* \* \*

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, \* \* \* in violation of the laws of the State in which they are committed or of the United States, \* \* \*."

Sections 1084 and 1952, Title 18 U.S.C.A., are relatively new statutes, having been in effect only since September 13, 1961.

The defendants in this action have brought a motion to dismiss the indictment upon the ground that the indictment does not state facts sufficient to constitute an offense against the United States.

The indictment alleges that defendants would travel to Hot Springs, Arkansas, where horse races were being held at the Oaklawn Park Race Track. One or more of the defendants would attend the races, and when the winner of a race was announced, they would communicate the results by radio to a codefendant who was outside the track. A codefendant would then immediately communicate the results by long distance telephone to a codefendant in Milwaukee, Wisconsin. The codefendant in Milwaukee would then "past post" bookmakers in Milwaukee, i. e., place bets with bookmakers who were unaware that the race was over and that the winner had been announced.

The first count of the indictment goes on to allege thirteen specific overt acts which merely elaborate upon the alleged scheme and need not be stated in detail here.

The second and third counts are not conspiracy counts but, briefly summarized, charge the defendants individually with traveling in interstate commerce with intent to promote and carry on a gambling enterprise; with using a telephone in interstate commerce to transmit results of horse races, which information assisted in the placing of bets on horse races; with performing and attempting to perform acts to promote and carry on gambling activities, all in violation of Sections 2, 1084, and 1952 of Title 18 U.S.C.A.

Defendants' motion to dismiss the indictment is based on the contention that the essence of all of the violations charged here is the allegation that defendants were involved in a gambling enterprise, and that the outlined facts on the face of the indictment show that defendants were not engaged in gambling.

It is beyond question, and counsel for the United States so concedes, that an indispensable element of "betting," "wagering," or "gambling" is the element of risk or chance. Every federal statute involving gambling offenses requires this element. See 18 U.S.C.A. Sections 1301–1304, and 15 U.S.C.A. Sections 1171–1177. Many judicial definitions of "gambling" were cited and many were found. None were cited or found that did not require the element of "chance." It is agreed by all parties that if the alleged scheme of the defendants did not involve the element of chance, then the defendants were not gambling, and if they were not gambling, then they cannot be tried for the offenses here charged.

Where Congress wanted to proscribe fraud, as in the mail fraud statute, the word is directly used, and fraud is not included within the statutes here involved.

The court believes that defendants' contentions are sound, and the indictment must be dismissed. However nefarious may be the alleged schemes, they did not involve the element of chance. The alleged bets or wagers placed with unsuspecting bookmakers involved what is known in common parlance as "a sure thing." The defendants were certain to win, and the bookmakers were certain to lose.

Counsel for the United States has cited a number of early cases which state the principle that, to constitute gambling, there need not be an equal chance of winning or losing on both sides of the transaction. It is sufficient, under the law as stated in these decisions, that one party takes a chance or risk that he may win more than the amount of money he has ventured. See, e. g., Horner v. United States, 147 U.S. 449, 13 S.Ct. 409, 37 L.Ed. 237 (1893). The principle of this decision and others cited by counsel for the United States is not authority for the situation alleged here. In this alleged scheme, it cannot plausibly be argued that defendants took a *chance* of winning more money than was placed in the bet. If they knew the winning horse and the bookmakers did not, then defendants simply cheated the bookmakers, and their crime must be dealt with under the proper statutory authority, whether it be state or federal.

Granted "gambling" exists where one party cannot lose but may win a greater or lesser amount depending on chance. No case has been cited or found in which it was held to be "gambling" where one party is bound to win and the other party is bound to lose a corresponding amount.

Counsel for the United States argues a second point which is equally untenable. He contends that defendants could not always be sure that they knew the winning horse because after the race is over, there may be a "foul" claimed against the ostensibly winning jockey, in which case presumably he would be disqualified; or there may be a "photo finish," in which case the horse that appeared to have won may, in fact, have lost; or an alleged coconspirator may have made a mistake in communicating the name of the winning horse to his coconspirator in Milwaukee. Counsel for the United States stated that he would prove at the trial that on at least one occasion the defendants did receive wrong information as to the winning horse.

Conceding for purposes of this motion that these incidents may have occurred, the alleged offense still does not involve the essential element of "chance" within the purview of the statutes. If one wishes to purchase securities through a stockbroker, there may be a "chance" that the broker may err in transmitting the order to the floor of a stock exchange, but no one could reasonably contend that this is "gambling." Nearly every activity and occurrence of life involves uncertainty. The old maxim might be applied, "Nothing is certain except death and taxes." Defendants cannot be charged with crimes because of such uncertainties as those raised by the government. The supposed "gamble" was upon a simple objective circumstance—the result of a horse race. Where such result is an accomplished fact at the time when the bet is placed, there no longer is a "chance" of its occurring in the future.

Further, with regard to the chance of a "foul" or a "photo finish" changing the apparent result, it is common knowledge that the official winner is not posted at the race track until the question of a "foul" or a "photo finish" has been determined. Under such circumstances, even that contingency is removed. No such contingencies were cited in the indictment. If those contingencies occur, the apparent winner would not have been the official winner.

■ It must be kept foremost in mind that these statutes—just as those involving lotteries, gift enterprises, and similar gambling schemes—are criminal statutes and, therefore, must be strictly con-

strued. See, e. g., Federal Communications Commission v. American Broadcasting Co., Inc., 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954); United States v. Halseth, 342 U.S. 277, 72 S.Ct. 275, 96 L.Ed. 308 (1952).

In the Halseth case, the United States Supreme Court affirmed the dismissal of an indictment by the United States District Court for this district on the ground that the defendant's activities did not constitute an existing gambling scheme within the strict meaning of the statutory offense there charged. The court in that case relied heavily upon an earlier decision—France v. United States, 164 U.S. 676, 17 S.Ct. 219, 41 L.Ed. 595 (1897).

In the France case, a lottery had been conducted in Kentucky. After the drawing was over, persons who were interested in the outcome, and who had taken money to the operators of the lottery for chances purchased, were returning across the state line to Ohio. They had in their possession the official print of the lucky number that had been drawn, slips that corresponded with the lucky number, known as "hit-slips," and money which was to be given to winners. They were arrested and charged with a conspiracy to violate a statute which prohibited the carrying across state lines of "any paper, certificate, or instrument purporting to be or to represent a ticket, chance, share, or interest in or dependent upon the event of a lottery, * * *" (now 18 U.S.C.A. Sections 1301 and 1302). Although the indictment therein charged an offense different from those here charged, the following quotation from the court's decision appearing on pages 682–683, on page 221 of 17 S.Ct., is equally appropriate in the instant action:

" * * * The lottery had already been drawn; the papers carried by the messengers were not then dependent upon the event of any lottery. The language as used in the statute looks to the future. The papers must purport to be or represent an existing chance or interest which is dependent upon the event of a future drawing of the lottery. A paper that contains nothing but figures which in fact relate to a drawing that has already been completed, one that has passed and gone, cannot properly be said to be a paper, certificate or instrument as described in the statute. It purports to show no interest in or dependent upon the event of any lottery. If the lottery has been drawn, the interest is no longer dependent upon it. The condition upon which the bet or the interest was dependent has happened; the solution of the problem has already been arrived at; the bet has already been determined. The bare statement of that solution or determination placed on paper does not impart to that paper the character of a certificate or instrument purporting to be or represent a ticket, etc., dependent upon the event of a lottery. From the statement upon the paper, the agent may acquire the knowledge which will enable him to say who has won, but the book or the paper does not purport to be and is not a certificate, etc., within the act of Congress.

"There is no contradiction in the testimony, and the government admits and assumes that the drawing in regard to which these papers contained any information had already taken place in Kentucky, and it was the result of that drawing only that was on its way in the hands of messengers to the agents of the lottery in Cincinnati.

"The statute does not cover the transaction, and however reprehensible the acts of the plaintiffs in error may be thought to be, we cannot sustain a conviction on that ground. Although the objection is a narrow one, yet the statute being highly penal, rendering its violator liable to fine and imprisonment, we are compelled to construe it strictly. Full effect is given to the statute by hold-

ing that the language applies only to that kind of a paper which depends upon a lottery the drawing of which has not yet taken place, and which paper purports to be a certificate, etc., as described in the act. If it be urged that the act of these plaintiffs in error is within the reason of the statute, the answer must be that it is so far outside of its language that to include it within the statute would be to legislate and not to construe legislation."

Counsel for the United States has cited one recent decision—United States v. Yaquinta, 204 F.Supp. 276 (N.D.W.Va. 1962)—in which the defendants were charged with conspiracy to violate Section 1084, 18 U.S.C.A., the same section involved here. The facts as stated by that court appear to be very similar to the alleged scheme carried on by the defendants in the instant action. Although the court denied a motion to dismiss the indictment, the motion was based on an entirely different ground. So far as is shown by the reported decision, this question as to whether gambling was involved was not raised and was not before the court. At least it was not mentioned by the court, and the decision was grounded on the question as to whether a telephone line going from West Virginia through a small part of Ohio and back to West Virginia was interstate.

In view of the foregoing, it is unnecessary to pass upon the motion of the defendant, Charles Elmer Cantrell, to dismiss the indictment on the ground that it does not state the necessary elements of a conspiracy.

IT IS HEREBY ORDERED that the motion of the defendants, and each of them, to dismiss the indictment is granted, and the indictment is hereby dismissed.

## DECISION ON MOTION FOR REHEARING

On September 25, 1962, this court entered an order dismissing the indictment in this action. On October 19, 1962, a rehearing was held, at which time the government asked the court to reverse its prior order dismissing the indictment. The motion is based on certain excerpts from the "legislative history" of the statutes involved which was not presented by the government at the initial hearing on the motion to dismiss.

The legislative history consists of certain statements of Attorney General Robert F. Kennedy, Congressman Emanuel Celler, and Senator James O. Eastland, all of whom explained that the purpose of the proposed statutes involved was to combat the evils of both "honest" and "dishonest" types of interstate gambling offenses. Congressman Celler specifically referred to the type of activities with which the defendants herein are allegedly involved.

The statutes here involved use the terms "gambling," "bets," and "wagers," all of which have always had a plain and unambiguous meaning as already pointed out in this court's prior decision and order dismissing the indictment. These terms have invariably been defined as activities involving the element of chance or risk. Should this court look to the legislative history of the statutes? It is urged that certain advocates of the legislation meant to have the statutes cover more than the common or ordinary "gambling" activities.

The Supreme Court, in rejecting petitioner's argument that the court should consider legislative history, stated in Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921 (1945), a case involving the construction of the Fair Labor Standards Act:

"The argument from the legislative history undertakes, in effect, to contradict the terms of § 8(f) by negative inferences drawn from inconclusive events occurring in the course of consideration of the various and widely differing bills which finally, by compromise and adjustment between the two Houses of Congress, emerged from the conference as the Act. The plain words

and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction. * * *"

In Ex Parte Collett, 337 U.S. 55, 69 S.Ct. 944, 959, 93 L.Ed. 1207 (1949), the court decided that the doctrine of *forum non conveniens* applied to actions under the Federal Employers' Liability Act. In rejecting petitioner's argument that the history of the change of venue statute should be considered, the court said at page 61, 69 S.Ct. at page 947:

" * * * The short answer is that there is no need to refer to the legislative history where the statutory language is clear. * * *"

The court then quotes from the Gemsco case, supra, and goes on to say:

" * * * This canon of construction has received consistent adherence in our decisions."

The court reiterated this view in construction of a criminal statute—Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917). In that case defendant was convicted under the White Slave Traffic Act of transporting a woman in interstate commerce for an immoral purpose; to wit, that the woman should become his mistress. Defendant argued that the legislative history showed that Congress intended that the words "any other immoral purpose" in the statute should reach only to commercialized vice. In rejecting this argument, the court stated at pages 485–486 and 490, 37 S.Ct. at page 194:

"It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms. * * *

"Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion. * * *

"Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them. * * *

* * * * *

"Reports to Congress accompanying the introduction of proposed laws may aid the courts in reaching the true meaning of the legislature in cases of doubtful interpretation, * * *. But, as we have already said, and it has been so often affirmed as to become a recognized rule, when words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn from titles or designating names or reports accompanying their introduction, or from any extraneous source. In other words, the language being plain, and not leading to absurd or wholly impracticable consequences, it is the sole evidence of the ultimate legislative intent. See Mackenzie v. Hare, 239 U.S. 299, 308 [36 S.Ct. 106, 60 L.Ed. 297]."

In Viereck v. United States, 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), the defendants were indicted for violation of a federal statute requiring the registration of certain agents of foreign principals. In reversing their conviction, the court stated at page 243, 63 S.Ct. at page 564:

" * * * The unambiguous words of a statute which imposes criminal penalties are not to be altered by judicial construction so as to punish one not otherwise within its reach, however deserving of punishment his conduct may seem."

Again, at page 245, 63 S.Ct. at page 565, the court stated that defendants are not to be held guilty " * * * of offenses which the statutes have omitted, though by inadvertence, to define and condemn. For the courts are without authority to repress evil save as the law has proscribed it and then only according to law."

In Gilbert v. United States, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962), the question for decision was whether or not the defendant, who had endorsed a government check by signing the name of the payee, followed by his own name as agent, when in fact he had no such authority, was guilty of "forgery" under 18 U.S.C.A. § 495. The Supreme Court held that since there was no significant legislative history relating to the meaning of the term "forge," it must look to its common-law meaning, further stating at page 655, 82 S.Ct. at page 1402:

" * * * For in the absence of anything else to the contrary it is fair to assume that Congress used that word in the statute in its common-law sense."

In vacating the judgment of the Court of Appeals on the ground that "forgery" at common law did not cover an agency endorsement, the court stated at page 658, 82 S.Ct. at page 1403:

" * * * Nor are we impressed with the argument that 'forge' in § 495 should be given a broader scope than its common-law meaning because contained in a statute aimed at protecting the Government against fraud. Other federal statutes are ample enough to protect the Government against fraud and false statements. * * * "

Section 1343 of Title 18 U.S.C.A. proscribes the transmission, or the causing of the transmission, by means of wire, radio, or television communication in interstate commerce any writing, signs, signals, pictures, or sounds for the purpose of executing any scheme or artifice to defraud or to obtain money under false or fraudulent pretenses under penalty of imprisonment for not more than five years or of a fine, or both. The meaning of that statute is plain. It proscribes what is alleged to have transpired here, but defendants were not indicted under that statute.

■■ There are Supreme Court decisions where legislative history is considered even though the language of the statute is seemingly plain and not ambiguous. This is a criminal statute and criminal statutes are to be strictly construed. The Supreme Court has often held that where the prosecution seeks to enlarge the boundaries of the proscribed act, it must do so by legislative process, not by expansion of the plain language of the statutes. See Ladner v. United States, 358 U.S. 169, 178, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); Bell v. United States, 349 U.S. 81, 83, 75 S.Ct. 620, 99 L.Ed. 905 (1955).

This court must look to the ordinary well-defined and unambiguous common-law meaning of the term "gambling." Other than a few random excerpts of testimony and statements made by the Attorney General and others before congressional committees investigating the need for anti-racketeering legislation, the government has not shown that Congress intended to broaden the common-law meaning of the term "gambling." "It is not to be supposed that, in signing a bill, the President endorses the whole Congressional Record." Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 396, 71 S.Ct. 745, 751, 95 L.Ed. 1035 (1951) (concurring opinion).

For the foregoing reasons, plaintiff's petition for reversal of the court's decision dismissing the indictment is hereby denied.